**WILCOX v. B. OLINDE & SONS CO., Inc., et al.**

No. 1839.

Court of Appeal of Louisiana. First Circuit.

June 14, 1938.

Johnson & Kantrow and J. Oliver Bouanchaud, all of Baton Rouge, for appellants.

Fred G. Benton and Carlos G. Spaht, both of Baton Rouge, for appellee.

OTT, Judge.

Plaintiff sustained a compound fracture of the olecranon process (elbow) of the

left arm on the 21st day of September, 1935, on the Greenwell Springs road, just outside the city limits of Baton Rouge. His claim is for $10,455.50, and the suit is against B. Olinde and Sons Company, Inc., the owner of the beer truck involved in the accident, Frank Vince, the driver, and the Hartford Accident and Indemnity Company, the carrier of the liability insurance on the truck.

Plaintiff claims that his injury was sustained in the following manner: that he was driving a Ford V–8 coach east on the said Greenwell Springs road, hereafter referred to as the road, on the date of the injury about dark, on the right hand side of the road, when the car he was driving was struck by a beer barrel, or barrels, that fell from said beer truck coming in an opposite direction; that he was driving well to his right side of the road, and when he reached a point where he was about to pass the truck, which was traveling at a fast and excessive rate of speed, the driver of the truck, Frank Vince, swerved the truck to the left side of the road, apparently for the purpose of passing some cars parked on the north, the truck driver's, right side of the road; that, after cutting into plaintiff's side of the road, the truck driver apparently saw the danger into which he had projected himself and suddenly and abruptly whipped or swerved his truck to the right, in an effort to get back on his side of the road; that this sudden and abrupt turn of the truck threw a beer keg off the truck with great violence to the left, which keg struck the car in which plaintiff was riding with his left arm resting on the ledge of the window, causing the injury for which the plaintiff is seeking damages. Specific acts of negligence are charged against the driver of the truck, but, in the main, they can be reduced to the above summary of plaintiff's contention.

Defendants deny any negligence on the part of the truck driver, but, on the contrary, they allege that the proximate cause of the accident was the negligence of the plaintiff in driving the Ford car at an excessive rate of speed and while same was overloaded with passengers; that plaintiff swerved his car to the left before he had completely passed the truck which was on its side of the road, and recklessly and without warning ran into the left rear end of the truck.

The greater part of the testimony was heard before Judge Ponder while sitting for Judge Womack in the District Court of East Baton Rouge Parish, and the remainder of the testimony was heard by Judge Womack after he returned to the bench, and who rendered a judgment in favor of plaintiff against all three defendants, in solido, for the sum of $3,622.50. The defendants have appealed.

The decision of the case both in the trial court and on the appeal involves purely questions of fact. If the accident happened as plaintiff contends, it is obvious that the driver of the truck was guilty of negligence in attempting to pass the parked cars ahead of him in the face of the oncoming car driven by the plaintiff, and in swerving his truck suddenly back to the right with such force as to precipitate the beer keg onto the car driven by plaintiff. But, on the other hand, if the accident was caused, as defendants claim, from the fact that plaintiff pulled his car to the left before he had passed the truck on the right side of the street, and crashed into the left rear end of the truck, it is equally obvious that plaintiff has no one to blame for the accident but himself.

In addition to the large number of exhibits filed in the record, the evidence embraces some 374 pages of testimony by numerous witnesses. The judge who rendered the opinion below gave lengthy and exhaustive reasons for judgment covering some twenty-seven typewritten pages, in which he reviewed and analyzed the evidence very fully. In this court, we are favored with very earnest and persuasive briefs by the attorneys on both sides. The case thus presents one of those situations where a one hundred per cent perfect decision could not be expected from either the trial court or the appellate court. It is unfortunate that the judge below who was required to decide the case did not have the opportunity of hearing all the witnesses testify instead of only a part of them. It is because of this fact that this court has been impelled to give extraordinary study to the record in this case, with the result that, after careful reading, checking, analyzing and comparison of all the evidence by all members of this court to the minutest detail, the court finds itself unable to reach a unanimous conclusion on the facts.

■■■ The learned counsel for defendants are not unmindful of the rule so uni-

formly followed by the appellate courts to the effect that the findings of fact by the trial judge will not be disturbed unless manifestly erroneous, but they seek to escape the full effect of this rule in the present case for the reason that the trial judge who decided the case was not in much better position to value and appraise the testimony of the witnesses than the members of this court. But it should be observed that the judge below who decided the case did hear the driver of the truck give all of his testimony, and also heard the companion of the driver, in the truck with him at the time, give some testimony in rebuttal, from which he had the opportunity of seeing and forming some impression as to the credibility of both of these witnesses, the most important witnesses for the defendants. In addition to these two witnesses, the trial judge rendering the opinion heard several mechanics, and saw and heard briefly several witnesses called by defendants in rebuttal and on other points. In fact, the testimony which the judge who rendered the judgment heard covers some 118 pages of the total of 374 pages of testimony. We do not know if he knew any of the other witnesses whom he did not hear testify, but it is fair to assume that he knew more of the credibility of all the witnesses than the members of this court could know. It remains a fact that for this court to reverse the judgment on the question of liability, it would be necessary for us to point out errors in the finding of facts by the judge below sufficiently important to justify a reversal. This we are not able to do.

The accident happened at the intersection of Connell Street and said Greenwell Springs Road. This street intersects the road from the south, but it does not continue on north across the road. Connell Street is graveled and appears to be 50 feet wide from curb to curb. The road has an 18 foot pavement along the northern part with a graveled shoulder some 5 feet wide. The rest of the road on the south side is graveled until within the intersection, where the pavement reaches from curb to curb. At the southeast corner of the intersection, there is a combined store and filling station operated by Jack Michelli. From the maps offered in evidence, it appears that the pavement in front of this store is about 30 feet across the road.

About 23 feet east of the east line of the intersection, Ostend Street goes off to the north. If the east and west lines of Connell Street are extended to the north side of the road, the intersection is formed with no outlet, to the north. Traffic going north would have to continue east on the road some 25 feet and turn up Ostend Street. According to the preponderance of the testimony, the accident happened in front of Michelli's store, or slightly to the east of the center of the intersection. This would place the point of the accident anywhere from 20 to 40 feet west of the west side of Ostend Street.

There were about eight persons in the Ford car, including the plaintiff, who was driving. All were colored people, and they were going for a baby of one of the occupants of the car. Sitting in the front seat with plaintiff were Wilmer Jordan and Kinch Quiette—Jordan on the right and Quiette next to the driver. Undoubtedly, these three negroes had a good opportunity of seeing how the accident occurred. Their account of the accident has some variations and discrepancies, but on the whole it is about as follows:

Wilcox was driving on his side of the road going east when the beer truck approached coming west at a rapid speed; there were two cars parked on the north side of the road about in the mouth of Connell Street; the truck swerved to the left in order to go around these parked cars; Wilcox slowed down almost to a stop and pulled further to his right; just as the truck was about to pass the car, it whipped back to its right, and a beer barrel fell off the left side of the truck, struck the left fender of the Ford and mashed the fender down on the wheel, and then the barrel rolled on the ground and got under the truck; the barrel was either under or near the truck when it stopped; that the Ford went over to the curb on the right side in front of Michelli's store and stopped.

Wilmer Jordan says that the barrel struck plaintiff's arm as it rested on the ledge of the window; Wilcox says that he had his arm sticking out the car window, and he thought the barrel struck it. Feltus Johnson, who was sitting in the middle on the back seat, testified that the barrel fell off the truck and mashed in the left front fender, and when he saw the barrel again, it was under the truck. He also corroborates the other three witnesses in their statement that there were some cars parked on the north side of the road. Johnnie Jordan, who says he was sitting in the back seat on the right, gives about the same account of the occurrence as the other four

witnesses, except that he did not see the barrel after the truck stopped. Three colored women who were on the back seat also testified, but they did not know much about what happened. One of them did say that she saw the barrel under the truck after it stopped, and that there were two cars parked on the north side of the road.

The account of the accident as given by these occupants of the car is corroborated in the main by a colored preacher, Billoups, who says that he was standing in front of the Michelli store and saw the accident. This witness was subjected to a very grilling cross-examination by counsel for defendants, and he has received a rather severe castigation at the hands of these attorneys in their brief. We agree with counsel that this witness seems to have been rather anxious to tell what he knew and undertook to tell more than he probably saw, but we attribute this somewhat to the usual enthusiasm and verbosity of this type of witness. An effort was made to impeach this witness by the defendants who produced two other witnesses who claimed to have been standing in front of this store and who testified that Billoups was inside the store when the accident happened. Under the circumstances, it may be proper to give little weight to the testimony of this witness, but we see no reason to disregard it altogether.

Elijah Hammond, who claims to have no interest in the case, says he was walking east along the south side of the road some 40 feet from where the accident occurred; that he heard the noise and saw a barrel rolling in the street and that this barrel stopped under the truck; that there were cars parked on the north side of the road. This is the principal evidence from eye witnesses produced by the plaintiff.

Before discussing the testimony of the witnesses for the defendants, we should say that some of the witnesses for the plaintiff stated that when the truck swerved to go around the parked cars, it came over about the middle of the road, while some said that the truck came over on the south side. The body of the truck is 6 feet and 9 inches wide, and it is apparent that, if there were cars parked on the north side of the street, partly on the shoulder and partly on the pavement, as is customary, it was necessary for the left side of the truck to go over the center line of the pavement in giving a safe clearance between the parked cars. Counting the 5 foot shoulder, there was only 14 feet from the ditch on the north to the center of the pavement, and assuming that the parked cars were a foot or two from the ditch and that a like space would be left for passing these cars, there would be left only 10 or 11 feet for both the parked cars and the truck, thus necessitating the truck going south of the center line if it did attempt to pass parked cars.

But the contention of the defendants is that there were no parked cars on the north of the road, and consequently there was no necessity for the truck to go around them; that the truck did not turn to its left, but continued on its right side of the road.

The driver of the truck and Oscar Johnson, an employee of the Olinde Company and who was riding on the seat by the driver, gave practically the same testimony. They say that the truck was going about 20 miles per hour and continued on its side of the road; that there were no cars parked on the north side; that the Ford passed the truck on its side of the road, but just after the front of the Ford and truck had passed each other, they felt a terrific jar and jolt; that they looked back and saw that the Ford had struck the rear end of the truck and was going over toward its right side of the road where it parked; that the truck stopped in a few feet; that the jar threw the beer barrels on the truck off on the north side, but that no barrels were thrown off on the left side; that the drive shaft, brake rod and housing under the truck were broken and were lying on the ground. One of these witnesses says that the truck was hit about 23 feet west of Ostend Street, and the other estimated the distance as 10 feet from this street.

In support of these two witnesses, defendants placed on the stand two white men, John Adams and David LeBlanc, and a colored boy, E. V. Profit, all bystanders and who claim to have seen the accident. They corroborate the truck driver and his companion on the important parts of their testimony—that there were no cars parked on the north side of the road; that the truck did not swerve to the left; that the Ford ran into the rear end of the truck; and that no beer keg was thrown off on the left side of the truck. These witnesses add another important feature to the case when they fix the speed of the Ford as excessive—one of them stating that the Ford was going about 45 miles per hour and did not check up before it struck the truck, and another of the witnesses gave the speed of the Ford as 35 to 40 miles per hour, and the negro boy con-

tented himself by saying the the Ford was going "fast" and did not check up much before the accident.

While we cannot go as far as the trial judge in his statement discrediting these witnesses, it does appear that some of their testimony is rather unreasonable—particularly that of the two white men. Like Billoups, who testified for plaintiff, they give the impression of having seen too much and of being a little over-anxious in telling what they did see. As casual bystanders, it strikes us as unlikely that they could have seen all the details of the accident as they undertook to relate when they were not expecting anything to happen.

■ Another witness, Barber, who was some 300 feet or more from the scene of the accident, also undertook to tell how it happened, but we think the trial judge correctly gave little weight to his testimony as it is obvious that he was not in a position to see just how the accident happened, and he, too, was not expecting anything to happen.

If we had to rely solely on the verbal testimony of the witnesses for a solution of the question, there would be so much conflict as to make it impossible to determine with legal certainty how the accident occurred, and in that case we would feel justified in reversing the finding of fact by the trial judge. But, in our opinion, the physical facts and circumstances support the plaintiff's side of the case and tend to disprove the position of the defendants so as to balance the scales in favor of plaintiff and make it possible to conclude with reasonable certainty that the accident was caused by the negligence of the truck driver.

In the first place, we observe that the testimony shows that the Ford was not damaged on the front as it would have been had it run into the side of the truck. The left fender of the Ford was mashed down from the top, and not from the front. One witness for plaintiff even going so far as to say that the prints of the hoops on the beer keg were discernible on the fender. But we can hardly accept that statement other than as the opinion of this witness, who was an automobile mechanic. Moreover, there were no signs on the side of the truck where defendants claim the Ford struck it. The damage to the truck was underneath the body of the truck. It is difficult to believe that the drive shaft and radius rod under the body of the truck could have been knocked down by the Ford striking the truck on the rear end.

The beer kegs were just a little over 15 inches in diameter at the ends and a few inches larger in the middle. If one of these kegs did get under the truck as claimed by plaintiff's witnesses, it would have been natural for the brake rod and drive shaft under the truck to be raised up by this barrel, as these parts of the truck were just a little lower than the barrel, and the raise in the barrel would tend to tilt the truck on the left side toward the right—thus throwing the barrels off on the north side. This seems to account for the fact that there was no damage on the body or side of the truck, but that the damage caused underneath the body of the truck was from the barrel that got under the truck.

It is not denied that the Ford car was on its side of the road—in fact the driver of the truck admits that it was—until and unless it suddenly swerved or turned in to the left to go into Ostend Street, but this street was several feet ahead of the point of the accident, and there was no occasion for plaintiff to turn in at that point, unless he was very much confused. The Ford stopped on the right side of the road, over against the curb. It is difficult to believe that this Ford could have turned to the left from its side of the road just as it was passing the truck, struck the left rear of the truck, and then turned around to its right and parked itself up against the curb on the right hand side. If the Ford did strike the truck while turning at an angle to the left, and if it was traveling half as fast as some of defendants' witnesses say it was, the Ford would not have turned back to the right, but would have been thrown back to its left by the truck, and the passengers would have been precipitated forward with great force.

■ The body of the truck was built with about a 6 inch incline from the outer edge to the center on both sides, so as to tilt the barrels toward the center. The testimony of the truck driver and his companion was to the effect that they had never known of beer kegs falling off the truck before. This being true, it is hardly possible that the striking of the Ford against the rear part of the truck would have thrown all these barrels off on the right or north side. The truck would have had to be tilted up from the left side to bring about this result, and, in our opinion, that is just what would happen if one of these barrels got under the left side of the truck. We do not mention these facts in support of any theory as to how the accident happened, but as corroboration of the

testimony of the plaintiff's witnesses as to how the accident did happen. We are mindful of the fact that plaintiff cannot recover on a theory imputing negligence to the truck driver, nor by indulging in hairsplitting speculation as to the cause of the accident, but that plaintiff must prove with legal certainty that the accident was caused by the negligence of the truck driver.

■ In our opinion the trial judge was justified in his finding of fact that the truck driver was negligent; that he swerved to his left to pass these parked cars in the face of the oncoming Ford; and that as the truck was suddenly swerved back to the right, a beer barrel or barrels came off on the left side and struck the Ford car on the left fender, mashing it down against the wheel. The weakest part of plaintiff's evidence as to the cause of the injury to his arm lies in the fact that he does not give a very clear explanation of the manner in which the barrel struck his arm. The evidence shows that his arm was in the window of the car—or as he says, sticking out the window—and he was driving the car with both hands. Wilmur Jordan says that he saw the barrel strike plaintiff's arm. It is not to be expected that either plaintiff or his witnesses could tell just how the barrel caused the injury to plaintiff's arm as the whole thing happened in a moment. The fact remains that plaintiff's elbow was fractured at the point where it was projecting out the window of the car, and it is just as plausible to believe that the barrel caused the injury as it struck the Ford, as it is to believe that the body of the truck caused the injury, if, as defendants contend, the Ford ran into the truck.

■ As the evidence shows to a legal certainty, as found by the trial judge and in which finding we can point out no errors, that the beer barrel did fall off the truck and strike the Ford while the Ford was on its side of the road, there is negligence shown on the part of the truck driver and no contributory negligence is shown on the part of plaintiff. In that case, the negligence of the truck driver must be taken as the sole and proximate cause of the accident as well as the resulting injury to plaintiff's arm from the barrel, whether the barrel itself struck plaintiff's arm, or whether the jar from the impact of the barrel on the car caused plaintiff's arm to strike some part of the car. As already stated, we find no manifest error in the finding of fact of the trial judge, and

therefore affirm his judgment insofar as it places liability on the defendants.

■ But we think the amount of damages awarded is excessive. Plaintiff lost in salary $122.50, and this item was properly allowed. It is not certain from the medical testimony that the injury to plaintiff's arm is permanent. When he returned to work three or four months after the injury, he was able to perform the type of work he had been doing—that of janitor, washing glassware, cleaning an office, wiping off desks, etc.—in almost, if not as good a manner as he did before the accident. Ten months after the injury plaintiff could extend his left arm about 132 degrees compared to an extension of his normal right arm of 155 degrees. One doctor, called by defendants, says that plaintiff is not disabled more than 10 per cent in his injured arm, and that he could do certain kinds of manual labor; that he is not disabled more than 25 per cent from doing hard manual labor, and with use of his arm, he may have no disability for this type of work. Dr. Hatcher, called by plaintiff, could not say if plaintiff's injury is permanent, but expressed the opinion that if plaintiff got an 85 per cent use of the arm he would be lucky.

Plaintiff did suffer considerable pain from the treatments given his arm and in the forced manipulations given at regular intervals to restore normal motion in the elbow. At one time, it was necessary to administer an anaesthetic in order to break up adhesions in the elbow by forced manipulations of the joint.

We think that an award of $1,500 for pain and suffering and for the disability occasioned by the arm injury would be about in line with the awards in similar cases. But, as we have often said, no hard and fast rule can be laid down for fixing damages in cases of this kind, other cases merely serving as guides. In appraising the damages in this case, we have been guided largely by the awards in the following cases which we consider most appropriate in the present case: Southern v. City of New Orleans, 10 La. App. 335, 120 So. 528; Rogge v. Caficro, 15 La.App. 565, 131 So. 207, 132 So. 159, 134 So. 909, and Marsiglia v. Toye et al., La. App., 158 So. 589.

For the reasons assigned, the judgment appealed from is hereby amended by reducing the amount of the damages from $3,622.50 to $1,622.50, and, as thus amended, the judgment is affirmed; the appellee to pay

the cost of the appeal, and the appellants to pay all other costs.

Le BLANC, Judge (dissenting).

I am not satisfied that the demand of either the plaintiff or that of the defendant B. Olinde & Sons Co., Inc., plaintiff in reconvention, is supported with sufficient evidence, and I am of the opinion that both should be dismissed as in case of non-suit.