JANVIER, Judge.
On June 7, 1955, plaintiff, an employee of R. P. Farnsworth and Company, Inc., general contractors, sustained injury which ultimately made it necessary that two phalanges of his left little finger and two phalanges of his ring finger be amputated. Maximum compensation for 42 weeks and medical expenses, amounting to $1,021.92, were paid by American Automobile Insurance Company, the compensation insurance carrier of the employer and the compensation payments were then discontinued since the insurer, on medical advice, felt that the employee could return to his former employment. He then brought this suit against the said insurer, praying for judgment for $30 per week for 400 weeks, together with medical expenses in the sum of $1,000 and praying also for penalties at 12% and attorney’s fees, basing his claim on the allegation that discontinuance of compensation payments was arbitrary and capricious and without probable cause.
The defendant insurer admitted the occurrence of the accident and the payment of compensation for 40 weeks (it later developed that compensation payments had actually been made for 42 weeks), but denied liability for further compensation payments.
There was judgment in favor of plaintiff for $30 per week for 150 weeks subject to a credit of $1,260 representing payments for 42 weeks, and there was an award of attorney’s fees at 20% on the amount of the judgment. All other demands of the plaintiff were rejected. From this judgment plaintiff, Walter Spurlock, appealed. The defendant insurer answered the appeal praying for judgment dismissing the suit.
It is obvious that the District Judge was. of the opinion that plaintiff was entitled to-compensation based on the loss of the use of a hand, since he rendered judgment for 150 weeks in accordance with LSA-R.S. 23:1221(4) (e).
It is the contention of the defendant insurer that compensation should have been awarded for 40 weeks only; that plaintiff did not lose the use of the entire left hand but lost only two phalanges of each of two fingers, the little finger and the ring finger of the left hand; that for the loss of one finger, other than the thumb or first finger,, an injured employee is entitled to compensation for 20 weeks and that according *768 ly for the loss of two phalanges of each of two fingers this plaintiff should have been awarded compensation for 40 weeks in accordance with section 23:1221(4) (c) of the compensation statute.
On the other hand, on behalf of plaintiff it is contended that not only did he lose two fingers of the left hand, but that, as a result of the loss of those fingers and because of the delay in the amputation, his entire hand is now permanently useless, and that since he is a laborer he can no longer engage in the work at which he was formerly employed, and that thus being totally and permanently disabled, he is entitled to compensation for 400 weeks as provided in section 1221(2) of the compensation statute. And it is also contended that he is entitled to the penalty and attorney’s fees which may be awarded where the refusal of the insurer to pay compensation is arbitrary, capricious or without probable cause.
Counsel for defendant in their brief and in oral argument state that the questions presented are: (1) What were the duties of plaintiff at the time of the injury, i. e., was he a laborer or were his duties confined to the supervision of others? (2) Whether the loss of the use of the other fingers of the left hand is real and if so, did that loss of use result from the accident? (3) What is the extent of plaintiff’s disability?
In contending that plaintiff was not a laborer, defendant relies largely upon an allegation in plaintiff’s original petition to the effect that he was “an assistant foreman.” Pointing to this allegation, counsel for defendant argue that an assistant foreman does not himself engage in the performance of labor and that therefore the loss of the two fingers did not interfere with the performance of the duties in which plaintiff was engaged at the time of the accident.
In order to accept this argument as sound it would be necessary that we evidence judicial knowledge that an assistant foreman does not engage in labor. This judicial knowledge we do not have. Furthermore, in a supplemental petition plaintiff made the allegation that at the time of the accident he was “a working foreman” and that “a working foreman is sometimes referred to as an assistant foreman or a sub foreman.”
The important question is not the title which was given to the plaintiff by his employer, but the type of work he was required to perform and particularly the type of work he was performing at the time of the occurrence of the accident.
It is not disputed that plaintiff was a member of a certain labor union which, under an agreement with the employer, furnished the employees who were engaged in doing the work in which plaintiff himself was engaged when injured. In that agreement it is provided that when in such a crew or gang of workmen as were then engaged there are “eight or more but less than twelve * * * there shall be a ‘working foreman’ who will perform manual labor if requested by the contractor.” The said agreement also provides that “when twelve or more laborers are employed, the foreman shall not be required to perform manual labor.” The record does not show just how many men were engaged in the gang or crew of which plaintiff was a member and surely the defendant could easily have provided this information. But whether, under that particular provision of the contract plaintiff could have been required to perform manual labor, the record leaves no doubt at all that he not only sometimes was required to do so, but that without objection on the part of the employer he often did so and was engaged in in such heavy manual labor at the time of the occurrence of the accident.
When asked what type of work he was doing at that time, he answered: “Labor work,” and then when asked to describe the work, he said that he was engaged in “spotting and landing a crane bucket which would dig mud, pick up mud and the oper *769 ator would bring it out and dump it.” This was obviously a very heavy bucket, and he says that at the time, “I was trying to spot the crane bucket, * * * ” and that “the operator brought it over too far and I slipped and' grabbed the piling and landed the bucket down on my hand.” And he also said that the bucket weighed “over one thousand pounds, maybe twelve hundred * * *. I know it was plenty.” He also said that the bucket was so heavy that “you need somebody to push the bucket or pull it to place it in the rig’ht place. Sometimes it takes two or three men, according to how close it is.” Obviously this is heavy labor.
As a matter of fact, Mr. R. A. Louvier, the general superintendent of the employer, said that the plaintiff “was the assistant labor 'foreman; that at the time of the accident the plaintiff and his gang were “excavating for pile cap footings,” and at that time plaintiff “had some men in the hole who were doing shovel work,” and that while it was not the particular job of the plaintiff to push the bucket into position, “normally our labor foreman pitch in and do things like that. If they are in a place where they could do it, they do it.”
Having concluded that plaintiff, though he had been granted the somewhat dignified title of assistant or working foreman, was often required to perform and, at the time of the accident, was actually performing common labor, it becomes necessary for us to determine whether the injury sustained will prevent his entering into competition with other such laborers in obtaining, in the future, similar gainful employment.
In Jackson v. Steel Fabricators, Inc., La.App., 90 So.2d 397, 400, we discussed at some length the possible distinction where compensation is claimed between a common laborer and a skilled laborer, saying that
“jf a common laborer sustains injury which may prevent him from engaging in one or two or even a few particular kinds of common labor but that he is nevertheless able to do many other kinds of common labor, he is not totally disabled and entitled to compensation for partial disability in some cases where his ability to earn has been reduced, or to compensation based on the impairment of the member where that impairment has not resulted in the reduction of his ability to earn.”
If the injury to the plaintiff is, in fact, limited to the loss of two phalanges of each of the two fingers of his left hand, we would have some difficulty in concluding that a laborer, especially one having the title of assistant or working foreman, has, by the mere loss of those phalanges of those fingers, been deprived of his opportunity to competitively secure employment as a laborer. It is possible that the physical loss which was sustained might not have impaired his ability to undertake many forms of labor. In Scott v. Hillyer Deutsch, Edwards, Inc., 217 La. 596, 46 So.2d 914, our Supreme Court found a case in which the actual objective physical injury was remarkably similar to that of the present plaintiff. There the injury consisted in “the loss of [his] little finger and two phalanges of his ring finger of the left hand.” The Supreme Court found that the work of plaintiff was “that of a common laborer.” But the Court also found that
“the work which he has performed since the injury is work of the same or similar character as that which he was accustomed to perform or which he did perform prior to the injury.”
It was held that he was not entitled to compensation based on disability, but was due only such compensation as is provided for the specific loss of the left little finger and two phalanges of the ring finger. This decision indicates that there may be -cases in which laborers who sustain such a loss as plaintiff sustained may be able to perform sufficient different kinds of labor to justify the conclusion that compensation should not be based on total disability.
*770 Here, however, the evidence is very convincing that plaintiff cannot again engage in the labor at which he was required to work and at which he was working prior to the injury. Whether this disability is due solely to the loss of the two fingers or is due to the fact that, as a consequence of that loss, he has sustained the loss of the function of the entire hand, is a much disputed question.
Dr. Daniel Riordan, an orthopedic surgeon who specializes in the treatment of hands, apparently was convinced that even if the amputation of the fingers did not actually cause the inability to use the other fingers of the hand, the plaintiff sincerely believed that he could not use those other fingers and that therefore the entire hand had been adversely affected by the amputation of the two fingers. Dr. Riordan states that “it became obvious rather early that the patient was having considerable difficulty in using the rest of his hand * * He stated that he felt that physical therapy might improve conditions and that he therefore subjected Spurlock to “a very intensive physical therapy,” and that “over the next about five months, I believe, we gave him, well over ISO physical therapy treatments * * * in an attempt to get motion back into the thumb, index and long finger.” He stated, however, that he was convinced that the disability of the hand actually amounted to about 30%, and he said, at the time of the trial,
“ * * * I believe his index and long finger are more stiff today than they were when I saw him before * s}: * »
Dr. William Fisher, a physician, said that in his opinion there was a “mental block” which prevented Spurlock from using the other fingers of that hand. He was obviously of the opinion that the plaintiff was sincere in believing that he could not use the hand.
Dr. Robert C. Lancaster, a psychiatrist, was of the opinion that plaintiff sincerely believed that he could not use the other fingers of that hand. He was asked if, in his opinion, the plaintiff had been told “we * * * were going to cut (them) off if you don’t use it,” whether “you think he would be able to move those three fingers,” and he answered: “No, I don’t think that he would.” Dr. Lancaster was asked for the result of his examination of Spurlock, and he said that from the history of his case and from what plaintiff told him when a certain rubber piece which had been placed between the thumb and forefinger is removed, the thumb was immediately brought “into opposition to the forefinger and it could not be moved voluntarily or either with force.” He was also asked whether the inability to move the fingers “is an unconscious situation which Walter Spurlock has no control over? ” and he answered: “No, there is no doubt.”
It is true that Dr. W. Randolph Page, a neurologist, seemed to have the opinion that the inability to use the other fingers was simulated. However, Dr. Page examined Spurlock only once, whereas Dr. Riordan treated him over a very long period of time.
Dr. William A. Roy, another physician, saw plaintiff only from the time of the injury until he was turned over to the surgeon for amputation of the fingers.
It would serve no useful purpose to discuss at greater length the testimony of the doctors. Suffice it to say that we find that by a substantial preponderance the medical testimony indicates that plaintiff cannot use the hand no matter how much he might desire and attempt to do so. Whether this is due to the fact that the functioning of the hand has been actually made impossible by the loss of the two fingers, the delay in amputating them, and the pain associated therewith, or whether it is due to the fact that plaintiff has become sincerely convinced that he cannot use the hand, it is not necessary for us to determine. * In other words, whether the inability to use the hand is due to an actual posttraumatic neurosis, or whether it is due to some physi *771 ■cal interference with the muscles, tendons, hones, etc., of that hand we cannot determine. All we can say is that the medical testimony preponderates to the effect that plaintiff is convinced that he cannot use the hand in any kind of work.
We have always found it difficult to persuade ourselves that the facts of any particular case justify the conclusion that, as a result of an injury, posttraumatic neurosis has developed to the extent that the injured person sincerely believes that the injured member can no longer function and we have always been of the opinion that the distinction between posttrau-matic neurosis and compensation neurosis is so nebulous that we should not conclude that there is actual posttraumatic neurosis unless the proof is quite convincing.
In Hicks v. Royal Indemnity Company, La.App., 80 So.2d 553, 558, we said:
“We have no doubt that an employee who is thus really disabled as a result of post traumatic neurosis is as fully entitled to compensation as .is an employee who sustains physical disability. However, in such a case the evidence must be carefully scrutinized because of the fact that compensation neurosis is so closely akin to post traumatic neurosis that the faint line between them is so indistinct that it is extremely difficult to determine on which side of the line each particular case should be placed. We recognized this in the Ladner case, saying ([Ladner v. Higgins, La.App.] 71 So.2d 242, 245):
“ ‘We are fully cognizant of the caution which we must exercise in a case of this nature, in view of the nebulous characteristics of a neurosis.’ ”
However, there have been cases in which allowance has been made for disability due solely to posttraumatic neurosis. We found such a case in Singleton v. W. L. Richardson & Son, Inc., La.App., 95 So. 2d 36.
In Fossier v. D. H. Holmes Co., 19 La. App. 434, 139 So. 709, 710, which was not a suit for compensation but a tort action, we held that a sincere belief in disability should be taken into consideration in assessing damages. Referring to the plaintiff, we said:
“since he really believes that he cannot use his jaws, and since he has not used them normally for some time, such belief and such nonuse has brought more or less into reality a condition which, at first, was largely imaginary. * * * ”
Our conclusion is that, either because of actual physical disability of the other fingers of plaintiff’s left hand, or because he is sincerely convinced that those fingers are disabled, he is able to make very little use of his left hand and, being a laborer, is consequently totally and permanently disabled.
When we come to consider the question of whether plaintiff is entitled, as against the insurer of the employer, to the penalty provided by LSA-R.S. 22:658, we reach the conclusion that, in discontinuing compensation payments, the insurer did not act arbitrarily, capriciously or without probable cause. The medical experts, by a preponderance of evidence, were of the opinion that Spurlock could have returned to what they believed was his former employment. He had told each one of them that he was a foreman and they assumed that, as a foreman, he was not required to do manual labor and thus they advised the employer and the insurer that he could have returned to work. Therefore, in discontinuing payments the insurer did not act without probable cause.
In Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399, 402, the Supreme Court was faced with a situation resembling that which confronts us. There penalties and attorney’s fees were demanded on the charge that compensation had been discontinued arbitrarily, capriciously *772 and without probable cause. The Supreme Court, finding that compensation was due, also found that payments had been discon-ued, “defendant’s physician having instructed plaintiff to resume his duties at the saw mill.” The Court said:
“ * * * it does not appear that defendant’s actions with respect to the payment of compensation were arbitrary, capricious or without probable cause. Hence, plaintiff is not entitled to recover the penalties and attorney’s fees demanded.”
Since we believe that the discontinuance of compensation payments was not arbitrary, the penalty and attorney’s fees provided by LSA-R.S. 22:658 are not due.
Though the statute mentioned — the so-called Insurance Code — does provide for a penalty and an attorney’s fee in certain cases, the situation here does not justify the imposition of the penalties nor the requirement that an attorney’s fee be paid. Nor is there any provision for an attorney’s fee in the Compensation Act.
In its original opinion in Hall v. Pipe Line Service Corporation, 233 La. 821, 98 So.2d 202, 206, the Supreme Court erroneously awarded attorney’s fees in a compensation case. On rehearing, the Supreme Court itself noted the error and, after discussing LSA-R.S. 22:658 and also several provisions of the Workmen’s Compensation Statute and particularly LSA-R.S. 23:1141, said:
“We interpret the above section to mean that attorney’s fees are to be paid from the compensation award in a manner fixed by the Court. Therefore, our original decision was in error in allowing attorney’s fees over and above the compensation awarded to plaintiff. * * * ”
In Arbo v. Maryland Casualty Company, La.App., 29 So.2d 380, 383, we said:
“ * * * Nowhere in the Employer’s Liability Act, Act No. 20 of 1914, is there any provision imposing liability on a defendant in a compensation suit for the fee of the plaintiff’s attorney, and the allowance of the $1,000 was unwarranted. Bouchon v. Southern Surety Co., 151 La. 503, 91 So. 854.”
Plaintiff also asks for an award to cover medical expenses in the sum of $1,000. The compensation act, as amended (LSA-R.S. 23:1203), now provides for liability for medical expenses not in excess of $2,500. The record shows that the insurer here has paid medical expenses of $1,021.92. However, we do not find that the record indicates that the plaintiff has himself paid or will become liable for additional medical expenses.
It is true that Dr. William Fisher, who was employed by counsel for plaintiff, made an examination and saw the plaintiff three times — on June 26, July 12, and August 14, 1956, and that he was of the opinion that additional physiotherapy might be beneficial. He stated that he had not submitted a bill but estimated that it would be $165. We cannot tell from the record whether that bill represents the services on the three occasions on which Dr. Fisher saw the plaintiff, or whether it would be the estimated cost of the treatments which he recommended. In view of the uncertain and indefinite character of this testimony no allowance for that particular fee can be made. Thus the claim for additional medical expenses must be disallowed.
The judgment appealed from is amended so as to read as follows:
It is ordered, adjudged and decreed that there be judgment in favor of Walter Spur-lock and against the American Automobile Insurance Company for workmen’s compensation at the rate of $30 per week for a period not in excess of 400 weeks beginning June 7, 1955, with interest on all past due payments at 5'% per annum from the due date thereof, until paid, subject to a credit of $1,260 representing compensation at the rate of $30 a week for 42 weeks *773 heretofore paid to the plaintiff hy the defendant.
It is further ordered, adjudged and decreed that all other demands of the plaintiff be and they are hereby rejected and that all costs of this suit be borne by the defendant.
Amended and affirmed.