McBRIDE, Judge.
On December 22, 1953, a door of a railroad boxcar fell from its moorings with *98 out warning- and struck Ezeldal Baxter on the head occasioning, severe and extensive personal injuries.
The freight car in question, labelled T & P 80212, owned by The Texas & Pacific Railway Company, had been placed in a train made up in Alexandria, Louisiana, and hauled to and spotted at the plant of Elder Lumber Company at Marksville, along the line of The Texas & Pacific Railway Company, where it was loaded with lumber consigned to Ipilc Plywood Company. From Marksville, The Texas & Pacific Railway Company transported the car to May’s Yard in Jefferson Parish and there delivered it to The Illinois Central Railroad Company for delivery to the consignee at or near Kenner, Louisiana, the situs of the accident.
Baxter (sometimes hereinafter called “plaintiff”) brought this suit against both of said railroad companies seeking to recover of them in solido the sum of $63,000 for personal injuries and incidental losses and expenses. Hi's principal charges of negligence against the defendants are that they failed to keep the car in a safe-operating condition and make proper and adequate inspection of the car before placing it in operation. Travelers Insurance Company, the workmen’s compensation insurance carrier of plaintiff’s employer, joined in the suit as party plaintiff claiming reimbursement for the compensation paid Baxter in the sum of $1,268 under the provisions of the Workmen’s Compensation Statute, LSA-R.S. 23:1021 et seq. Said insurer prays that said amount be paid to it out of any award made to Baxter.
The case was tried on its merits and plaintiff recovered judgment against The Texas. & Pacific Railway Company for $6,235, the compensation insurer was awarded $1,268 to be paid out of plaintiff’s judgment, and the witness fees of certain of plaintiff’s medical experts were fixed and taxed as costs. The suit as against the Illinois Central Railroad Company was dismissed. The Texas & Pacific Railway Company has perfected this appeal. Plaintiff filed answer thereto praying that the judgment be increased to the sum of $25,-000. Plaintiff also prayed in his answer to the appeal that the judgment insofar as it dismissed'the suit against the Illinois Central Railroad Company be reversed and that he have judgment against said defendant. Of course we cannot disturb that portion of the judgment in favor of the Illinois Central Railroad Company. The jurisprudence is well settled that an answer to an appeal cannot serve the purpose of an appeal with respect to bringing into court parties against whom a plaintiff’s claim has been dismissed. Succession of Jackson, La.App., 77 So.2d 194, and cases therein cited.
The gravamen of the defense tendered by The Texas & Pacific Railroad Company (hereafter designated “defendant”) is that the freight car was in good and satisfactory condition and had been the subject of adequate inspections which disclosed no apparent defects therein.
The door in question was described as an all-metal three-section door which operates on rollers passing over an iron rail or track at the bottom, having a metal guide at the top which holds the door to the side of the car and prevents it from falling off. There are no rollers on top, just the guide; when closed the door is held in position by a lever which when pressed down raises the rollers into position on the bottom rail and permits the opening of the door.
The injured man, when the accident befell him, was an employee of the consignee, Ipik Plywood Company, and, with several fellow workmen, was attempting to open the door for the purpose of unloading the shipment of lumber in obedience to the instructions of his foreman. It does not appear nor is it contended that any force was used to push the door, and plaintiff’s evidence is uniformly to the effect that the door was not jammed or stuck and readily opened. The men used nothing but their bare hands in their efforts and the door fell off the car when it was halfway opened.
*99 After Baxter had been injured, an inspection of the car conducted for the purpose of ascertaining the cause of the accident revealed that the bottom door rail or track was bent in the middle, the depression being abont one inch, and it is conceded by defendant that the door fell when the rollers thereon reached the bent or depressed area of the bottom rail. Defendant’s foreman claims that the bent condition of the bottom rail was the only defect, but plaintiff’s witnesses say that in addition to the bent bottom rail the guide at the top of the door was broken. However, it is unnecessary to resolve such factual issue, and for the purposes of this opinion we shall adopt the contention of defendant that the only defect which existed was the bent condition of the bottom door rail or track, which is the view most favorable to defendant.
Plaintiff sought to invoke the doctrine of res ipsa loquitur.
 Res ipsa loquitur is not a rule of pleading or of substantive law; rather it is a rule of evidence, the applicability of which is to be determined on the conclusion of the trial. Gerald v. Standard Oil Co. of Louisiana, 204 La. 690, 16 So.2d 233. After reviewing all of the evidence, we do not believe that there is room to admit the doctrine of res ipsa loquitur in this case, for the simple reason that the record discloses what caused the accident, the reason therefor, and whether defendant was negligent.
It is argued on plaintiff’s behalf that the law placed on defendant the duty of having made a complete and thorough inspection of the car before making delivery thereof to the lumber company for loading, and that whereas defendant has not shown that it made such an inspection and the car was delivered to the shipper in a faulty or defective condition, there was actionable negligence on defendant’s part. Plaintiff cites Jacob v. Illinois Cent. R. Co., 133 La. 735, 63 So. 306, 308, and Franklin v. Illinois Cent. R. Co., La.App., 13 So.2d 125, wherein it was held that it is the duty of carriers to examine cars with the view of seeing that they are safe in all their parts.
There was considerable discussion by counsel for all parties with reference to the amount of care to be exercised by a railroad company in inspecting its rolling stock, it being the plaintiff’s position that defendant, who was the initial carrier in this case, is held to a higher degree of care in that respect than a connecting or delivering carrier. Plaintiff contends that the defendant should have made a thorough and minute inspection of the car before delivering it to the shipper.
In support of that position counsel points to certain language in Jacob v. Illinois Cent. R. Co., supra, and Franklin v. Illinois Cent. R. Co., supra. In the Jacob case a piece broke out of the sill of a flat car carrying with it two of the stanchions which were in the iron pockets attached to the sill, causing the death of the plaintiff’s husband. The evidence as to the cause of the accident showed that the sill was affected with dry rot. The defendant was the connecting carrier, and in speaking of the duty required of it in making an inspection of the freight car received from another carrier, said:
“It is the duty of the owners of cars to examine them carefully with the view of seeing that they are safe in all their parts. It is also the duty of a railroad company which receives cars from another company to inspect the same with the view of ascertaining their condition. * * *
* * * * * *
“ * * * the sill was affected with dry rot; but to what extent we cannot say. There is no evidence going to show that the usual outward indications of dry rot were present in this instance. And while we are of the opinion that the presence of dry rot in such a piece of timber might be discovered by the use of a hammer, and *100 perhaps in other ways, we are not disposed to hold that a connecting carrier is required to make a complete ■ and thorough inspection in every detail of every freight car which it receives from another railroad, while in course of transit. Such inspection might he required of the owner of the car or of the initial carrier; hut it could not be reasonably required of a connecting carrier; * * *.”
The Court’s conclusion was that the death of plaintiff’s husband resulted from a latent defect in the car which the defendant could not have discovered upon a reasonable inspection, and the suit was dismissed.
This court in the Franklin case was concerned with a claim for damages for personal injuries occasioned by the fall of a door from a boxcar while in possession of the delivering carrier. No one was able to give any reason for the accident or tell why the door fell. It appeared from the evidence that a reasonable and careful inspection of the car had been made by an employee of the carrier, and we held that the examination described by the employee in his testimony was sufficient. In dismissing the suit we said [13 So.2d 129.]:
“ * * * The Public Belt made the final inspection of the box car, which it may be presumed was similar to that given the flat car in the Jacob case, since it was the same railroad, and we hold here, as was held there, that it was a reasonable, careful inspection which could not have been expected to discover the defect in the door any more than the inspection given the flat car in the Jacob case could have been expected to reveal the defect in the sill of the flat car. * * * ”
But we further remarked:
“ * * * As the opinion in the Jacob case plainly points out the obligation of a connecting and delivering carrier is quite different from that of the initial carrier or the owner of the car.”
It is immaterial for this court to consider in the instant case whether an initial carrier, such as was The Texas & Pacific Railway Company, is under the duty of making a more thorough inspection of its cars than required of a connecting or delivering carrier, because the evidence, even that introduced by the defendant, demonstrates the fact that defendant was guilty of negligence in that it delivered a car to the shipper which could not be used with reasonable safety because of a defect therein which might readily have been discovered upon a reasonable, careful inspection.
Car T & P 80212 was empty when included in the train made up in Alexandria which carried it to Elder Lumber Company. Defendant has proved that after the car had been loaded with the lumber that several inspections were made at various points en route to the consignee and all of the inspectors, who were employees of either The Texas & Pacific Railroad, or the Illinois Central Railroad, stated they were certain there were no apparent defects in the car. No minute inspection was ever made until Routich examined the freight car subsequent to the accident, and it was then disclosed that the bottom door rail was in the defective condition.
There is a unanimity of opinion on the part of all witnesses appearing on be'half of defendant who took part in the inspections that after the lumber was loaded aboard the car and the doors thereof closed and sealed, it would have been almost impossible for anyone making a reasonable, careful visual inspection to have noticed the bend or depression in the bottom door rail with the naked eye, because the bottom of the door concealed the rail from view. It also appears from the testimony of plaintiff’s witnesses that the defect could not be noticed when the door was closed. In the light of this evidence we believe we *101 can readily understand and appreciate why none of the car inspectors noticed the defect after the car was loaded at the lumber yard and the door closed and sealed.
Members of the train crews testified while en route T & P Car 80212 was not involved in any accident, or damaged, or subjected to rough or unusual treatment. This testimony taken at its face value can only lead to the presumption that the defect, i. e., the bent condition of the bottom door rail, must have existed prior to the time the train was made up in Alexandria.
This brings us to the focal and decisive point in the case, and that is whether the employees of defendant at Alexandria, from which point the car was dispatched to the shipper, should have been expected to observe and ascertain the defective and unsafe condition of the empty car.
Hubert J. Duhon, an employee of defendant, was the car inspector on duty at Alexandria, and his testimony shows that he inspected the train consisting of twenty-three cars, within a period of thirty minutes by testing the air brakes and looking at the cars on both sides. Although T & P Car 80212 was empty, he was unable to say whether either or both of its doors were open. Duhon insists he found no defective equipment, else he would have “bad ordered” the car. However, the witness made the significant admission that he could have observed the defect in the door rail had the door been open. His exact words are: “Probably then you could see a little kink or bend.”
Two employees of Elder Lumber Company appeared as witnesses on behalf of defendant and stated that when the empty car was delivered to and spotted in the lumber yard, one door thereof was open and one was closed, but nothing in their testimony enlightens us as to whether it was the offending door that was the one that was open. According to these witnesses, during the loading process both doors were opened wide and after the lumber was aboard the doors were closed and then sealed. Neither of them noticed anything amiss and both say the doors were closed without any difficulty whatever.
We have no information on the subject whether the defective bottom door rail would prevent the door from being closed, but it is beyond question that this defect was the cause of the door falling when plaintiff and his fellow workmen attempted to open it at the plant of Ipik Plywood Company.
The car furnished by defendant to the shipper in this case was defective and in an unsafe state of repair. If the defendant knew not of these circumstances, to exculpate itself from liability for plaintiff’s damages it became encumbent on defendant to show that the unsafe condition of the car could not have been discovered upon a due inspection.
Duhon did not know whether either or both doors of the freight car were open when the train was made up, but from the testimony of the two employees of the lumber company who say that one door was open upon delivery of the car, we feel sure that there was an open door when the car left defendant’s yards. It might well be that the door that fell from the car and injured plaintiff is the identical door that was open when Duhon inspected the train at Alexandria, and if that door was open there was no reason why he should not have noticed the bent bottom rail as he himself professed the ability to have observed the defect had the door been open. Our conclusion in the case is that whereas defendant furnished a car which was defective and unsafe, which circumstances could have been ascertained even upon a reasonable, careful inspection, defendant’s liability unto plaintiff for his damage is clear.
In 75 C.J.S. Railroads § 924, p. 333 it is stated:
“A railroad company owes a duty to all persons who are required to go *102 on or about its cars or cars which are furnished or delivered by it in connection with its business to exercise reasonable or ordinary care to inspect such cars, and to have them in such repair or condition that they may be ■used with reasonable safety, or to give notice or warning of defects in such cars which are discoverable by due inspection to persons who are entitled to such notice or warning. These duties may be owing to the shipper and to his employees, with respect to loading, or to the consignee and to his employees, with respect to unloading. * * * ”
Plaintiff was rendered unconscious as a result of the blow on the head inflicted by the falling door and was conveyed to the Flint-Goodridge Hospital in New Orleans where he was placed under the care of Dr. Herman Rabin, general surgeon, who discharged him on February 4, 1954, at which time Dr. Rabin’s opinion was that plaintiff’s subjective and objective manifestations had “regressed.” Plaintiff’s stay in the hospital lasted until January 2, 1954, and he was treated as an outpatient until discharged by Dr. Rabin. His injuries had been diagnosed as a small laceration of the scalp accompanied by severe headaches and pains in the neck and a knee. Initially it was believed he had sustained a fracture of the skull, but subsequent X-rays failed to substantiate that diagnosis. Dr. Rabin subsequently saw plaintiff on August 23, 1954, and his opinion was that there had been a complete recovery from the effects of the accident.
During the course of the treatment Baxter was kept in neck traction for a period of forty-eight hours because of complaints of headaches, a roaring in the ears, and photophobia (glare and light hurting the eyes). Dr. Rabin thought a neurosurgical examination necessary and to that end called in Dr. Howard Karr, a neurosurgeon.
Dr. Karr saw and examined plaintiff at the hospital and made written report of his findings to Dr. Rabin on December 30, 1953. This report states that there was no external evidence of trauma except a small abrasion on the head and no neurological disability was present. Dr. Karr saw and examined Baxter for the second time on January 11, 1954, also at the request of Dr. Rabin, because the patient had been complaining of continued photo-phobia and headaches. Dr. Karr could find nothing wrong with the patient but recommended that there be a continuation of the “present conservative” therapy.
Dr. J. Ralph Phillips made examination of plaintiff’s eyes and sinuses in January 1955 and could find no damage to the eyes or nose, but made a recommendation that there be a “physical checkup by an internal medicine man.”
Dr. Frank J. Jones, a specialist in internal medicine, made an examination of plaintiff on January 17, 1955, and found that neither the subjective nor objective symptoms bear any causal relationship to the injury.
Baxter insists he has not been, able to return to work since the accident except for a few weeks he was given some light work to do at the plywood plant which he says he was unable to continue. He testified that he is unable to work because light hurts his eyes and:
“My head is bothering me pretty bad right now. That roaring will never stop. Of course, I’m no doctor but I have the roaring and I know what it is. I experience it at night when I go to bed and when I get up in the morning, it’s the same. It’s not going to stop. I know it ain’t.”
Plaintiff claims that prior to the accident he had always been in perfect health and his present difficulties developed subsequent to the boxcar door falling on him. The testimony of plaintiff when considered in conjunction with other medical evidence contained in the record presents to the court the question whether he is suffering *103 presently from some form of neurosis resulting from trauma sustained in the accident.
Dr. Robert Gilliland, a psychiatrist, saw Baxter in July 1954, and his opinion was that the patient was emotionally disturbed at the time and he recommended that Baxter return to his office on additional visits for treatment. Baxter returned about two weeks later and also in November 1954 and March 1955. The treatment consisted of the intravenous administration of sodium pentothal, which is a quick-acting sedative. The physician explained he used the sedative to help reinforce his own diagnostic impression that Baxter was genuinely emotionally disturbed, and since the sedative worked so successfully, he determined to use it as a treatment.
Dr. Gilliland stated that the sodium-pentothol would be known to the layman as “truth serum.” He felt that Baxter’s complaints of headaches, photophobia and a roaring in the ears denoted a type of hysterical reaction because of the nature of the history of his injury and the type of complaint he was making so:
“I felt it was important to try to differentiate as to what was going on with him and whether he was malingering.”
On the last occasion Dr. Gilliland saw him his opinion was that plaintiff was unable to return to work, but he thought the chances for recovery were reasonably good provided some final disposition could be made of his damage suit. The physician said Baxter’s present condition was precipitated by the accident, and although Baxter may be in perfect physical condition organically, he could be suffering from pains which are real rather than imaginary. He ruled out the imaginary aspect as a result of the administration of the truth serum.
It was brought out clearly by Dr. Gilli-land that the content of plaintiff’s thoughts was rational and sensorium seemed to be intact, which eliminated the possibility of any organic brain damage.
Dr. Tharp Posey, also a psychiatrist and witness for plaintiff, supports Dr. Gilli-land’s testimony. He examined Baxter November 1, 1955, and.his diagnostic opinion was that plaintiff had classical hysterics or what is known as “conversion of emotional disorder into physical symptoms without any organic basis.” He gave plaintiff no treatment, found no brain injury, and thought the neurosis was relatively mild.
Dr. Posey, like Dr. Gilliland, believes if plaintiff was paid an adequate sum of money in recompense for his injury that he would probably recover from his illness-in short order, but if the claim for damages was not settled, Baxter would become more disabled from the bitterness and resentment he would harbor.
There is not one word of countervailing evidence in the record, and what Drs. Gilli-land and Posey testified to was not challenged by anyone from the witness stand.
This court has several times been concerned with both tort actions and cases arising under the Workmen’s Compensation Statute involving post-traumatic neurosis, compensation neurosis, etc., and in some of the cases the plaintiff’s sincere belief in disability or injury was taken into consideration in awarding compensation or assessing damages.
In an opinion handed down by us this day in the case of Spurlock v. American Automobile Insurance Company, La.App., 101 So.2d 766, the laborer claiming compensation had sustained the loss of'two phalanges of his left little finger and two phalanges of his ring finger. -Competent medical experts testified that the plaintiff believed that he could not use the other fingers of the hand and, therefore, the entire hand had been adversely affected by the loss of the two fingers. We granted the workman the maximum compensation for his disability. However, we observed [101 So.2d 771]:
*104 “We have always found it difficult to persuade ourselves that the facts of any particular case justify the conclusion that, as a result of an injury, post-traumatic neurosis has developed to the extent that the injured person sincerely believes that the injured member can no longer function and we have always been of the opinion that the distinction between posttraumatic neurosis and compensation neurosis is so nebulous that we should not conclude that there is actual posttraumatic neurosis unless the proof is quite convincing.”
In the above-mentioned case we cited Singleton v. W. L. Richardson & Son, Inc., La.App., 95 So.2d 36; Hicks v. Royal Indemnity Company, La.App., 80 So.2d 553, and Fossier v. D. H. Holmes Co., 19 La.App. 434, 139 So. 709, 711, the latter being an action sounding in tort.
In Fossier v. D. H. Holmes Co., supra, the plaintiff sustained a contusion of the face which so affected either the muscles which operate the jaws or the bones of the jaws that it was thereafter impossible for plaintiff to open his mouth more than to about one-third of normal. The preponderance of the medical testimony on the subject was to the effect that the condition of which plaintiff complained was more psychic than real, and that if the sufferer could be persuaded that the jaws are all right and could be used, the disability would after a period of use disappear. In concluding that the plaintiff had sustained a real damage, we said:
“But, on the other hand, it cannot be said that a person who has been injured, and because of his bona fide conviction that his injury has rendered him incapable of performing some normal physical function, has actually lost his ability to perform such function, has not sustained a real damage.”
We have carefully scrutinized the testimony of the plaintiff in the instant case, and we cannot believe otherwise than that he is honest and sincere in his belief that his condition (photophobia, headaches and roaring in the ears) inhibits him from returning to his job. It has not even been suggested that he is a malingerer or that the belief he entertains that he is disabled is not bona fide. In order to deny his claim that he has been damaged because of an inability to carry on with his occupational duties, it would be necessary to entirely disregard the uncontradicted testimony of Drs. Gilliland and Posey which we feel we can hardly do.
There is no dispute regarding the item of $235 allowed plaintiff representing his medical expenses.
The award to plaintiff for physical injuries was $6,000, and we presume that this also embraced the amount of wages lost by virtue of the injuries. He was a laborer earning 90 cents per hour and worked a 40-hour week. The psychiatrists did not believe the disability to work would be permanent. However, plaintiff has not worked since the date of the accident, December 22, 1953, and his loss of earnings up to the date of trial in the court below is considerable. He was only able to return to his job for a few weeks and then for light work, and in addition to his earnings for this period he received the sum of $900 in the form of workmen’s compensation. Taking all circumstances into consideration, we believe that the award of $6,000 is inadequate to compensate plaintiff for his physical injuries, pain and suffering, and loss of wages, and we think that the award should be increased to the sum of $7,500, which will do substantial justice. Loss of earnings is to be properly allowed as an item of damages. Wilcox v. B. Olinde & Sons Co., Inc., La.App., 182 So. 149; Thomas v. Quatre Parish Co., Inc., La.App., 38 So.2d 520.
For the reasons assigned, the judgment appealed from is amended so as to increase the amount thereof to $7,735, and as thus *105 amended and in all other respects it is affirmed.
Amended and affirmed.
JANVIER, J., takes no part.