JAMES G. SCHILLIN, Judge ad hoc.
Plaintiff appeals from a judgment dismissing his suit for workmen’s compensation for permanent total disability against his employer, Noel P. Kammer, doing business as General Earthwork Service, and Marquette Casualty Company, the employer’s insurance carrier.
On September 21, 1955 plaintiff was performing his duties as a common laborer in assisting in moving a heavy 600-pound section of drainage pipe. While plaintiff’s witnesses disagree as to the precise manner in which this maneuver was being executed, it is sufficiently established that plaintiff, then approximately 48 years of age, was precipitated into a crouching or squatting position when one of the workmen helping to hold the pipe slipped causing much of the burden of the weight of the pipe to be thrown against plaintiff, as a result of which he sustained serious and permanent injuries and also “suffered a psychoneurosis.”
Defendants, in their answer, deny the material allegations of plaintiff’s petition while admitting that plaintiff was employed for one day and that his average weekly earnings were $44. In explaining why plaintiff was paid workmen’s compensation totaling $200.20 covering the period from September 23, 1955, the date of the accident, to November 10, 1955, it is asserted that these payments were made during the period of its investigation of the alleged injury and before it could be determined *575 whether any compensation was in fact due; that they also expended $136.29 for medical treatment to plaintiff. They further deny that plaintiff was injured in the course and scope of his employment, as alleged by him in his petition, and assert that he was in no way disabled, thus entitling him to no compensation whatsoever.
Defendants advance, in the alternative, the further special defense that, in event any disability was suffered by plaintiff, it resulted from and was due to a condition entirely disconnected with his employment, and in no way the consequence of any injury which he might have received on September 21, 1955. Defendants nowhere allege, however, the nature or source of the event or episode which they conclude was alien to his employment; furthermore, they say that plaintiff had entirely recovered by November 10, 1955 from any alleged injury, on which date compensation ceased and, accordingly, that he has received all of the workmen’s compensation to which he was entitled.
Plaintiff testified, and he is supported by some of his co-workers, that this accident caused an injury to his back, so much so that he performed only light duties for the rest of that day. He testified further that he did not go to work the next day, September 22, 1955 because of his injury, but that he reported to his employer on September 23, 1955 reciting the events which led to the above accident and his ensuing injury. Although September 25, 1955 was a Sunday, plaintiff nevertheless on that day contacted his employer again complaining of his injury whereupon the employer, being unable to locate his insurance carrier’s physician, sent plaintiff to Flint-Goodridge Hospital where Dr. William Roy examined him and noted that there was a spasm in his back for which plaintiff was treated and paid compensation.
Edward Diggs, one of plaintiff’s coworkers, who was then engaged in driving a “bulldozer”, testified that one of the men, assisting in carrying the pipe being supported in part by plaintiff, slipped; that the pipe was set down and plaintiff said he had hurt his back whereupon plaintiff sat down; that while he did not see plaintiff go down he testified positively that he saw him get up from the ground.
Marion Miller, another employee, corroborates plaintiff’s contention that “one of the fellows stumbled,” and that plaintiff complained he had hurt his back.
Plaintiff further testified that he explained to his employer that he did not appear for work the day after the accident because he had hurt his back; that he had a plaster on his back at that time. However, believing that he might be well in a short time he stated he wanted his job and was willing to come back to work. Plaintiff did not attend school; he learned to sign his name and read “a little bit”; that prior to the accident he was able to do heavy work without any trouble and he was never previously indisposed because of an abnormal condition in his back; that he has attempted since the accident to do heavy work, of the nature to which he is accustomed and the only work for which he is trained, but suffers with pains running down into his leg and he gets weak; that on occasions he gets numb, and therefore cannot hold down a job. Since the accident, in order to obtain a livelihood, he has sincerely tried to work, and he catalogues the establishments to which he has applied for work; that he is presently living with his sister, who has tried to help him as much as she can. He gave his testimony coherently and intelligently and counsel for defendants preferred to submit him to a very brief cross-examination, which apparently was not calculated to discredit plaintiff in any respect whatever. Upon being recalled by counsel for defendants for further cross-examination prior to the termination of the trial, plaintiff demonstrated without contradiction that he did his utmost to obtain employment and continue in same, all without avail. •
Although plaintiff was seen, according to the testimony in the record, by Dr. Wil *576 liam Roy and Dr. Jack Wickstrom, an orthopedist, and reference is made to reports of Dr. Hyman Soboloff and Dr. Teitelbaum, none of these physicians were produced as witnesses.
As no physician who examined plaintiff objectively shortly after the accident was placed on the stand, the nature of the original injury is ascertained and established from the testimony of the medical experts who testified concerning the existence of a post-traumatic neurosis, which condition is the basis of plaintiff’s claim that he is now totally and permanently disabled within the purview of the Workmen’s Compensation Statute.
Dr. Gene Usdin, who appeared for plaintiff and who qualified as an expert witness in psychiatry, stated that he examined plaintiff on three occasions, on February 9 and February 16 in 1956 and on February 15, 1957, shortly before this matter was tried below. In obtaining a full medical history, aside from the aforesaid examinations of plaintiff, he secured the report from Charity Hospital, examined the report of Dr. David Freedman, one of defendants’ witnesses whose testimony will be discussed later, and also analyzed the report of Dr. Jack Wickstrom who, as stated above, made an orthopedic examination of the plaintiff.
Plaintiff complained of pain in the lower back, which radiated towards the posterior aspect of his right thigh, also of other conditions which we shall discuss later, which had been brought about by what plaintiff characterized as a “snap” in his back.
Plaintiff testified positively that when he repaired to the Flint-Goodridge Hospital, where he was directed by his employer, the nurse looked at the “slip” which plaintiff handed her whereupon a physician acting for defendants consulted with him.
Dr. Howard Karr, placed on the stand by defendants as a medical expert, testified that after getting the history of a low back injury and pain, he ascertained that defendants’ examining physicians had treated plaintiff with heat, diathermy, injections and medications.
Plaintiff’s employer, having been placed on the stand for cross-examination, admitted the employment and the nature thereof. He does not contradict plaintiff, who testified that after the accident he was assigned only light work, and says that two days after the accident plaintiff reported the injury to his back, a further corroboration of plaintiff. This employer admitted that plaintiff had asked him about seeing a doctor whereupon he dispatched plaintiff to his office to get the name of the insurance doctor. No effort was made to rebut evidence by plaintiff’s witnesses that the accident had happened as related and that plaintiff had hurt his back.
Notwithstanding this overwhelming positive testimony that plaintiff suffered from some condition in his lower back, we are asked by defendants to conclude that no accident of any kind happened to plaintiff; in other words, that he is totally unworthy of belief. We have no hesitancy in resolving that plaintiff has overwhelmingly established that he sustained this injury to his lower back during the course and scope of his employment.
Counsel have conceded that such pathology in the area of the lower back as was present following this accident has disappeared, and that there are no objective residuals therefrom. The substantial issue in this case is whether plaintiff is suffering from a post-traumatic neurosis proximately caused by this accident, as alleged in his petition.
We now approach an analysis of this record with the firm resolution that plaintiff can only recover if we conclude that the disability in the instant case presents a genuine bona fide condition of post-traumatic neurosis, as distinguished from what we have heretofore characterized as “compensation neurosis.”
*577 We have heretofore observed in Spurlock v. American Automobile Insurance Company, 101 So.2d 766, 771 and repeated in Baxter v. Texas & Pacific Railway Company, 102 So.2d 97, 104:
“We have always found it difficult to persuade ourselves that the facts of any particular case justify the conclusion that, as a result of an injury, posttraumatic neurosis has developed to the extent that the injured person sincerely believes that the injured member can no longer function and we have always been of the opinion that the distinction between post-traumatic neurosis and compensation neurosis is so nebulous that we should not conclude that there is actual post-traumatic neurosis unless the proof is quite convincing.”
It is in such an exacting atmosphere that we now minutely scrutinize all of the testimony on this decisive phase of this action.
At the outset we are impressed with the straight forward manner of plaintiff’s recitals as well as the sincerity, honesty and truthfulness implicit therein. Because he was suffering with his back, he utilized the first Sunday he was not working (September 25, 1955) to seek out his employer for medical help. His persistent efforts, many times and in many places, to obtain employment; the actual labor performed by him, until pain and discomfort necessitated his stopping; his protestations to one of the medical experts, whose testimony we shall discuss hereafter, that he became dissatisfied because he believed his lawyer was more interested in his “legal welfare” than in his medical recovery, remonstrating that the attorney “had not seen that he had seen enough doctors” these and other circumstances apparent from this record all corroborate the genuineness of his contention that he is still disabled, and we are obliged to recognize the reality of plaintiff’s lamentation that “nobody will hire a sick man,” bearing in mind that at the time of trial he was 47 or 48 years of age. It is well established that prior to his injury plaintiff was able to do hard labor. Of course, we reiterate, that courts are loathe to allow recovery for post-traumatic neurosis on the testimony of the litigant alone, be he most honest and trustworthy.
Three medical experts testified, Dr. Gene Usdin, on behalf of plaintiff, and Dr. David F. Freedman and Dr. Howard Karr for defendants.
Dr. Usdin examined plaintiff on February 9, 1956 again on February 16, 1956, and on February 15, 1957, the latter examination taking place shortly before the trial below. Plaintiff having been previously examined by a neurologist and an orthopedist, Dr. Usdin made a psychiatric examination devoted to the functional components of plaintiff’s illness. The doctor reviewed what he characterized as the quite detailed reports of Drs. Roy, Karr, Soboloff, and the written report of Dr. Teitelbaum who is a radiologist, — he did not see the X-rays. He secured the report from Charity Hospital because he was interested in the previous medical history and he also was careful to consider the report of Dr. David Freedman, whose testimony we will discuss later, who had examined plaintiff between Dr. Usdin’s second and final examinations, as well as the report of Dr. Jack Wickstrom who made an orthopedic examination. In addition to pain in the lower back which radiated towards the posterior aspect of his right thigh, he also complained of fatigue, insomnia, and depressed feeling.
Dr. Usdin gave the unqualified opinion that the plaintiff had a “traumatic neurosis of a conversion type,” as a result of which plaintiff “has made only a borderline adjustment as far as being a productive useful member of society for his forty-eight years.”
Being alert to the possibility that plaintiff might be a malingerer, the witness interrogated plaintiff minutely on his availability for an exploratory operation to de *578 termine if anything could be done to aid his back. Although the Doctor explained that no assurance could be given of success, plaintiff on two occasions, one year apart, readily agreed to submit to an operation. Plaintiff appears very eager for medication; the malingerer or psychopath the Doctor asserted does not want medication.
Without further specification we are convinced from our microscopic overall examination of Dr. Usdin’s testimony that this expert has found in plaintiff's condition the basic essentials which the accepted standards of proof require to support an ultimate finding of post-traumatic neurosis of a conversion reaction type, such as existed in the Baxter case, supra.
Neurosis of the conversion type comparable to plaintiff’s was found to exist in Lala v. American Sugar Refining Company, 38 So.2d 415, 421, wherein we held:
“There is no doubt in our minds that nervousness, neurosis, or emotional disturbances, superinduced by injuries suffered by a workman, can be just as devastating to the ability to return to work as are physical or anatomical injuries, and are equally as compensable under the statute.”
A similar result was reached in Singleton v. W. L. Richardson & Son, Inc., La. App., 95 So.2d 36.
Again in Miller v. United States Fidelity & Guaranty Co., 99 So.2d 511, our brethren of the Second Circuit in considering and defining a true case of neurosis —conversion type — in an exhaustive and well written opinion, found such a condition, so long as it exists, to be completely and permanently disabling. Tate v. Gullett Gin Co., La.App., 86 So.2d 698.
While leaning heavily on the testimony of Dr. Usdin, counsel for plaintiff asserts that his plea of post-traumatic neurosis is amply established by the testimony of one of defendants’ own medical experts, Dr. David F. Freedman, and viewing Dr. Freedman’s testimony in a light most favorable to defendants, we are obliged to agree with that deduction.
Dr. Freedman was accepted by the Court as an expert in neurology and psychiatry and testified that he examined plaintiff on December 31, 1956, which of course was approximately one year and three months after the accident; that he took plaintiff’s history from him and conducted thereafter a neurological examination as well as interviewing plaintiff from a psychiatric standpoint; that the treatment given by the original doctors had been essentially ineffective in relieving the pain in the mid-lumbar region which is inconstant in character and which tends to radiate down the posterior aspect of the right thigh. Plaintiff insisted to Dr. Freedman, as he has done throughout, that at times he can work without pain and at other times he is quite miserable because of it.
As plaintiff had not been examined for approximately a year, this expert did a neurological examination on him, and was unable to find anything which was indicative of a structural lesion of his nervous system, which provoked the doctor to continue with his psychiatric interview. It was then that plaintiff, 47 years old at the time, stated that he had. never been married but that for some years he was having relations with a woman referred to as a “common law wife;” that approximately at about the time of the accident, there was considerable stress between him and this woman and there was some question about whether the relationship was going to continue and plaintiff was in this condition when his accident occurred; in other words, at the time of the accident he was very much concerned about the disruption of these relations.
Dr. Freedman continues:
“I had the feeling from my examination of this man that he was not in any sense consciously simulating; I couldn’t feel that he was, so to speak, *579 putting on or representing something as true, representing something which he wasn’t feeling.
“Feeling that way, and especially in the absence of any evidence of neurological damage, I felt that one would have to consider his problem one of the conversion reaction, a kind of a hysterical reaction, which was based — which was precipitated by his accident, but which was actually based on the kind of a person he is or with the kind of personality with which he was equipped when he had the accident, and that was the diagnosis I made.”
In the face of this self-destructive testimony from his own medical expert, a professional man, for whose qualifications, integrity, and veracity defendants had vouched, counsel for defendants attempted, all without avail, to adduce from his own witness testimony tending to militate against this physician’s ultimate findings and opinion.
Dr. Freedman at no time testified, nor could he very well conclude, considering the extent and quality of his testimony, that plaintiff was able to return to work of a reasonable character within the purview of the compensation statute, that is, to the only work for which his talents and education qualified him — common ordinary manual labor.
After the usual stipulation, the Court accepted Dr. Howard Karr as a qualified neurosurgeon on behalf of defendants. Dr. Karr examined the plaintiff only once, and that was on or about November 8, 1955, which was approximately a month and a half after the accident. After testifying to the medical history which plaintiff gave him and which coincides with plaintiff’s testimony and his statements made to Dr. Usdin, Dr. Karr testified that when he saw plaintiff on November 8, 1955, plaintiff told him that he was better than he had been when he was first seen by defendants’ original examining physician, which was shortly after the accident. Nevertheless, plaintiff stated to him that he was still complaining of pain in the lower back after being up for a while, and that the pain persisted in the lumbo sacral region extending down in a straight line into both buttocks; that plaintiff further insisted, after walking a while, the lower part of his back would hurt in the region above described and that when he sat up straight the pain appeared in the same area.
Dr. Karr thereupon made a physical examination to determine the existence of any abnormalities in his back or lower extremities; that there were no mechanical abnormalities and ho neurological abnormalities ; that his examination is termed a sensory examination consisting of testing the patient’s responses to touch, pin prick, position, figure writing; that on the basis of his objective examination Dr. Karr gave the unqualified opinion that plaintiff could do common heavy labor.
As counsel for plaintiff have conceded that no ascertainable objective pathology remained in the affected area, and as, in his capacity of neurosurgeon, Dr. Karr gave no evidence to overcome the effect of a finding of post-tramatic neurosis of a conversion reaction type, counsel for plaintiff drew the admission from Dr. Karr that in his testimony Dr. Karr was merely “speaking from a physical point of view.”
On further examination Dr. Usdin concluded :
“Q. Do you feel that this accident which he suffered on September 21, 1955, is the cause of his present, disability? A. I do.”
After testifying that some individuals never get cured of a traumatic neurosis, Dr. Usdin continued:
“Q. Doctor, again I ask the rather pointed question to you: That it is your testimony the traumatic neuro *580 sis of which this man complains or his general situation could be caused by something else other than this back injury of which he alleged? A. Another back injury could cause it; he could have been hit in the back; he could have been lifting something somewhere else.
“Q. Doctor, it could be caused by emotional conflict of some nature of type? A. But that specific type with the radiation down the right thigh. I have not heard of it. Maybe some other doctor has.”
Dr. Karr, the other expert for defendants, gave no testimony to support defendants’ theory that plaintiff’s present neurosis can be traced to some cause other than his accident. Dr. Freedman was very exact in his positive testimony that plaintiff was not a malingerer, and the testimony of Dr. Usdin is to' the same effect.
Accordingly, we find little difficulty in holding that plaintiff is suffering from a post-traumatic neurosis of a conversion reaction type brought on by the injury to his lower back, caused by this accident. It is well established by the evidence that this back injury constituted an organic basis over which there was superimposed this traumatic neurosis and, as Dr. Usdin points out, while apparently the organic basis is here no longer present, very often, when neurosis finds a road, it continues on that same road.
In this state of the record counsel for defendants are quite frank in their admission that Dr. Freedman had agreed with Dr. Usdin that plaintiff “was suffering from a neurosis,” but, say counsel, both of these experts have admitted that plaintiff’s “alleged sickness could have been attributed to some cause other than the alleged accident complained of.”
Moreover counsel for defendants, in their brief, have resorted to the dogmatic generalization that plaintiff has failed in “establishing the cause and effect relationship between said alleged accident and his inability complained of herein,” but we have looked in vain for any substantial showing in the evidence to justify this conclusion. True, we are reminded that Dr. Usdin has stated that there are other emotional factors than the ones in plaintiff’s case that could have precipitated the back pain; that, furthermore, there are other types of injuries or “thought injuries” to the back that could precipitate realistic organic pain or functional emotional pain, and it is accurate to say that Dr. Freedman has testified that it would have been possible for plaintiff to arrive at his present predicament in believing that he can no longer work even though there had been no accident. Mere possibilities of such self-evident facts offer no legal substitute for positive, direct testimony that other events or episodes, rather than this accident, are responsible for the post-traumatic neurosis which we find to exist in this case. While, as we have shown, defendants have made the same general averment in their answer that plaintiff’s neurosis is service disconnected, no evidence — medical or lay — upon which we could make such a finding has been adduced here to rebut plaintiff’s proof. Plaintiff has sufficiently carried the burden of establishing this phase of his case.
If it is the theory of defendants that the testimony relative to plaintiff’s rupture with his common law wife, and his sexual impotency is sufficient to overcome the evidence pointing to the accident as the sole cause of plaintiff’s condition, we conclude that such evidence affords defendants little solace.
In the first place, Dr. Freedman, defendants’ witness, in stating that there are many reasons why an individual can think he cannot perform manual labor, insisted that plaintiff had stated he was thoroughly capable of performing manual labor until the particular series of events, referring to the accident and injury. Furthermore, the doctor, in illuminating that an individual may have a series of symptoms which cannot be directly correlated with what you *581 find in examining him, expressly added, "* * * not jn particular case.”
Dr. Freedman at no time testified or even implied that plaintiff's condition is traceable to such emotional stress as might have been attendant upon plaintiff’s separation from his common law wife. The doctor testified that plaintiff told him “that approximately at about the time of the accident there was considerable stress between him and that woman, and there was some question that their relationship was going to continue, and it was in this condition that his accident occurred,” which is merely another way of saying that the accident may have aggravated plaintiff’s preexisting condition.
In Buxton v. W. Horace Williams Co., 203 La. 261, 13 So.2d 855, 856, the Supreme Court said:
“The issue in this case under the law is not whether the injury was the sole and proximate cause of the plaintiff’s present incapacity to work but whether the accidental injury aggravated and brought into active play his previous neurotic, mental or nervous troubles and was, therefore, the proximate cause of his present disability.”
In Dupre v. Wyble, 85 So.2d 119, 122, the Court of Appeal for the First Circuit stated that:
“As in other connections, a preexisting weakness in the form of a neurotic tendency does not lessen the compensability of any injury which precipitates a disability neurosis.”
Distinguishing between true neurosis and malingering may sometimes be difficult, and it has been suggested that there is no more potent curative or palliative therapy for “compensation neurosis” than a substantial award in compensation. If, for this reason or any other, plaintiff’s condition should improve in the future, defendants are privileged to seek modification of this decree. LSA-R.S. -23 :1331; Ladner v. Higgins, Inc., La.App., 71 So.2d 242; Singleton v. W. L. Richardson & Son, Inc., supra.
There is nothing in the record to support plaintiff’s demand for medical expenses not to exceed the sum of $1,000. The only medical witness produced by plaintiff was Dr. Gene Usdin, and plaintiff is entitled to recover his expert’s fee which we fix at $100.
LSA-R.S. 22:658 provides that insurance carriers under the compensation statute shall pay the amount of any claim due any insured within 60 days after receipt of satisfactory proofs of loss from the insured, employee or any party in interest, and that failure to make such payment (provided such failure is found to be arbitrary, capricious, or without probable cause) subjects the insurer to a penalty, in addition to the amount claimed, of 12% damages together with reasonable attorney’s fees. In the instant case plaintiff himself has established, and relies on such evidence to support his primary demand' for recovery, that on numerous occasions he attempted to work and did work for short intervals, until the pain became unbearable. There is no showing that the insurer here has been derelict in the sense ordained by the statute, and the claim for penalties and attorney’s fees must be disallowed. Spurlock v. American Automobile Insurance Co., supra; Carrington v. Consolidated Underwriters, 230 La. 939, 89 So.2d 399. It is true that defendants’ expert witness, Dr. Freedman, made a medical finding against defendants, but there is nothing to show that either of the defendants were apprised of Dr. Freedman’s conclusions prior to the trial below.
For the reasons assigned the judgment appealed from is annulled, avoided and reversed, and it is now ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Ruffin Parker, and against defendants, Noel P. Kammer, doing business as General Earthwork Serv *582 ice, and Marquette Casualty Company, individually and in solido, condemning them to pay plaintiff compensation during the period of his disability in weekly installments of $30 per week not to exceed 400 weeks, commencing September 21, 1955, with legal interest on each weekly installment from the date it became due until paid, subject to a credit of $200.20 which plaintiff has received in compensation for the period from September 23, 1955 to November 10, 1955; that there be further solidary judgment in favor of plaintiff for $100, expert’s fee for Dr. Gene Usdin; defendants to pay all costs.
Reversed.
JANVIER, J., absent.