71 So.2d 242 (1954)
LADNER
v.
HIGGINS, Inc. et al.
No. 20200.
Court of Appeal of Louisiana, Orleans.
March 29, 1954.
Rehearing Denied April 12, 1954.
Montgomery, Barnett, Brown & Session, New Orleans, for appellants.
Normann & Normann, New Orleans, for appellee.
REGAN, Judge.
Plaintiff, Lester J. Ladner, a "chipper", instituted this suit against defendants, Higgins, Inc., his employer, and Columbia Casualty Company, its insurer, endeavoring to recover workmen's compensation in the sum of $30 per week for a period of four hundred weeks. Plaintiff insists that he is totally and permanently disabled as a result of severe injuries incurred, in the course of his employment, by him on October 23, 1950. On this day he was the occupant of a scaffold, performing his duties as a chipper, preparatory to the launching of a ship, when the scaffold unexpectedly collapsed causing him to fall a distance of about eight feet to the ground; in the sequence of events the scaffold struck him on the right shoulder, and he is afflicted with a post traumatic neurosis as the ultimate effect of this accident.
Defendants answered admitting the occurrence of the accident, but denying that the plaintiff was permanently and totally disabled to such an extent that he was unable *243 to return to his former employment as a "chipper"; that plaintiff had recovered completely from the accident as of January 12, 1951, at which time compensation payments were discontinued.
From a judgment in favor of plaintiff awarding him compensation in the sum of $30 per week for a period not exceeding 400 weeks, defendant prosecutes this appeal.
The record reveals that after plaintiff was injured on October 23, 1950, as related hereinabove, he was initially treated by Dr. Joseph Scott, Jr., his employer's compensation physician, until January 12, 1951, at which time his compensation payments were discontinued on the hypothesis that he had no further compensable disability. Plaintiff related that he did not work for approximately one year following the accident; during this period of time he wore a brace designed to relieve his back injuries which had been provided by Dr. Scott; whenever he attempted to do any laborious work or to raise an object that was heavy he experienced severe pain which prevented his continuation thereof and, in many instances, it was necessary for him to secure bed rest therefor. Subsequently, because of financial necessity, plaintiff endeavored to return to work on other jobs at several places, but was usually discharged therefrom as a result of his inability to perform the assigned tasks due to the pain in his back. Briefly, the foregoing factual revelation has characterized plaintiff's spotty work history since the accident, which prior thereto had been very good. He finally and more pertinently related that he was devoted to the work of a "chipper", which he believed would remain his life long tradetherefore, he always retained his initial enthusiasm and anticipated returning to this occupation. During the course of his short employment, in an unrelated capacity, at Keesler Field, he watched another employee engaged in the operation of a "chipper gun", and when he put the gun down, plaintiff picked it up and held it for "three or four minutes" and then threw "it down". Immediately he suffered a reaction therefrom which induced temporary blindness and vomiting.
The record is quite voluminous and is embellished with expert orthopedic medical testimony furnished by both plaintiff's and defendants' doctors, to the effect that plaintiff had suffered no permanent bone pathology as a result of the accident of October 23, 1950. In fact, counsel for plaintiff concede that their client is not afflicted with any bone pathology in consequence of the accident, but that he has incurred, as an ultimate result thereof, a post traumatic neurosis, which has totally and permanently disabled him. Therefore, no useful purpose would be served by an analysis of this medical testimony.
We are of the opinion that the only question which the pleadings and the record of this case has posed for our consideration is one of fact and that iswhether the plaintiff incurred a post traumatic neurosis by virtue of the accident which occurred while he was employed by Higgins, Inc., on October 23, 1950, and which militates against the resumption of his former employment?
In the case of Lala v. American Sugar Refining Company, 38 So.2d 415, we said:
"There is no doubt in our minds that nervousness, neurosis, or emotional disturbances superinduced by injuries suffered by a workman, can be just as devastating to the ability to return to work as are physical or anatomical injuries, and are equally as compensable under the statute."
Respective trial counsel, in their effort to sustain their clients' position, each produced one medical expert in the field of psychiatry.
Counsel for plaintiff, in endeavoring to prove that Ladner is presently suffering from post traumatic neurosis, produced Dr. J. A. Holbrook, who testified that he had seen and examined plaintiff on June 5th, 1952 and February 6th, 1953, and he elucidated thereupon as follows:
"I examined him physically, and found a well developed and well nourished man. He walked normally and his standing position was normal. His bending forward was well performed. All of the tests and examinations from *244 a physical point of view and from an organic point of view were essentially normal. * * *
"I felt that he was suffering from a psychoneurosis or traumatic neurosis, and that was my diagnosis, and that still is my diagnosis."
Dr. Holbrook was convinced that if plaintiff had not fallen from a scaffold on October 23rd, 1950, he would not now be afflicted with a post traumatic neurosis and he was positive that he was not a malingerer. Dr. Holbrook, under cross-examination, related that in order for him to return to normalcy that "psycho therapy, encouragement, maybe physio theraphy" should be employed in the treatment. Relative to the prognosis of the neurosis, he expressed the opinion that plaintiff had improved since he first saw him in June and if his improvement continued at the same rate, it would require about three years to produce affirmative results. Again under cross interrogation and in response to the question:
"You don't think that this man will get well until this lawsuit is over"
he responded:
"One way or the other. If it is thrown out, he will do better. If it goes the way that he feels it should, it will go better. The conflict will be over, the mental conflict of going through this sort of thing, being held in suspense all the time; and that no matter how it goes, it will be pretty well over with, when one gets to that point of view, when that status arises."
In other words, the mere termination of the lawsuit would, per se, provide advantageous therapy for plaintiff's neurosis, since the conflict and its uncertain result would no longer frustrate him. However, he reiterated, the end of the suit would not of itself provide a cure.
In opposition thereto, Dr. Herbert Randolph Unsworth related that he examined plaintiff for approximately one hour and forty-five minutes on February 6, 1953, and that his principal complaint was that he could not perform the work of a "chipper" or any work which required lifting due to recurring pain in his back. Dr. Unsworth conceded that an injury such as plaintiff incurred on October 23, 1950, could cause a post traumatic neurosis. The court then interposed itself and requested him
"To make it more explicit, assuming he has a job in which he used one of these guns and he is hurt by a fall using it, could he have a pain only when he goes back to the same type of work and using the same type of gun".
He answered
"Each time."
However, Dr. Unsworth insisted "my impression in this particular instance is there is not sufficient evidence to support a neurosis," and that instead of being afflicted with a post traumatic neurosis, plaintiff was a malingerer for economic gain.
Finally, and of vast significance in our judicial determination of the serious medical issues involved herein, we find these pearls of wisdom emanating from the mouth of one whose testimony was being adduced to assist the court and whom we must presume, from the very nature of his profession, has accepted the Hypocratic Oath which, as we all know, is the foundation of medical ethics. In response to the question:
"Is that your conclusion that this man is a malingerer?"
Dr. Unsworth responded:
"I wouldn't be testifying if I didn't think so, unless I was on the other side, then it would be a post traumatic condition."
In addition to the opinion of Dr. Holbrook, which we are convinced is the most credible and professional psychiatrical evidence in the record, there appears the lay testimony offered in support of plaintiff's contention. We have made a careful analysis thereof and find that it fully sustains the *245 conclusion reached by Dr. Holbrook that plaintiff is afflicted with a post traumatic neurosis, which is the ultimate effect of the injuries incurred by him on October 23rd, 1950, and which now militates against the resumption of his former employment as a "chipper."
Of all the witnesses who testified in the case, only one is in a position to actually know definitely whether the plaintiff is able to resume his former employment and that is the plaintiff himself. The medical experts produced by both sides were in a position to express opinions only. Whenever the experts are in substantial disagreement they are of little aid to the court and, therefore, we must decide the case on the record as a whole, giving great weight to the lay testimony, the facts and environmental characteristics of the case, as well as to the conflicting opinions of the medical experts. After a comprehensive analysis of all of the facts, including the testimony of plaintiff, his prior good record, and the nature of the injuries incurred by him, we believe that he has sustained the burden of proof and has established with that certainty, which the law requires, his claim of total and permanent disability. We are fully cognizant of the caution which we must exercise in a case of this nature, in view of the nebulous characteristics of a neurosis, however, if plaintiff's condition should improve in the future, the defendants may avail themselves of the provisions of the workmen's compensation law, which affords them the right to reopen the case after the lapse of six months. Jones v. Atlantic and Gulf Stevedores, La.App.1949, 38 So.2d 653; Dixon v. T. J. Moss Tie Company, La.App. 70 So.2d 763.
We are of the opinion that the judgment of the court, a qua, is correct.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.
JANVIER, J., absent, takes no part.