JANVIER, Judge.
In this workmen’s compensation suit plaintiff claims to be totally and permanently disabled. In his original petition he averred that his disability was caused by the rupture of an intervertebral disc. More than two years later, the case not having been tried in the District Court, he amended his petition reaffirming his original allegations except insofar as they might be “in conflict with this supplemental petition,” and in his supplemental petition averred that he was “nervous, neurotic and emotionally upset,” and that his disability resulted from traumatic hysteria.
From a judgment in favor of plaintiff for 400 weeks at $30 per week defendant has appealed.
The only defendant is Royal Indemnity Company, the compensation insurance carrier of the employer.
In the original petition, plaintiff alleged that while breaking concrete,
“he placed a pick under the margin of a concrete block and pulled back forcefully, experiencing a sharp, lcnife-like pain in the center of his lower back, and sustaining as a result thereof a severe injury to his back and left leg.”
Fie further alleged that he had been treated by the physician of the employer until June 4, 1951, and then discharged as able to return to work; that in spite of his discharge he was examined by Dr. Homer D. ICirgis, a neurosurgeon on the staff of the Ochsner Clinic in New Orleans, who diagnosed his condition
“as a herniation of the fourth lumbar intervertebral disc with compression of the fifth lumbar nerve on the left, and stated that he is disabled for the performance of the work he had been performing at the time of his injury.”
It thus appears that in his original petition, which was filed on October 9, 1951, he claimed that he had sustained an actual physical injury of which there was objective evidence.
The defendant, in due course, on November 15, 1951, admitted that it was the compensation carrier of the employer of plaintiff, but denied that plaintiff had sustained any injury which disabled him beyond the time, June 4, 1951, at which time he was discharged by the physician as able to return to work.
No action of any kind was taken by plaintiff or defendant for more than two years after the filing of the suit until, on January 12, 1954, counsel for plaintiff took the necessary action to place the case on the call docket of the Civil District Court for the Parish of Orleans in order that it be fixed for trial. Thereafter the case was fixed for trial on four different occasions, but on each it was continued by preference and not taken up for trial.
On March 29, 1954, this Court rendered a decision in the matter of Ladner v. Higgins, Inc., 71 So.2d 242. In that case we focused attention on the fact that there might be recovery in compensation for disability caused by post traumatic neurosis. In other words, that there might be a case in which an employee, having fully recovered from actual physical injury, might, because of his sincere belief that he was still disabled, be actually disabled as a result of that belief, although there remained no physical residual of the injury.
We cited our earlier decision in Lala v. American Sugar Refining Co., 38 So.2d 415, 421, in which we said:
“There is no doubt in our minds that nervousness, neurosis, or emotional disturbances, superinduced by injuries suffered by a workman, can be just as devastating to the ability to return to work as are physical or anatomical injuries, and are equally as compen-sable under the statute.”
Shortly after our decision in the Ladner case was rendered — to be specific on April 20, 1954, plaintiff in the case at bar filed a supplemental and amended petition in which he reaverred all of the allegations of his original petition “except as may be *555 amended or in conflict with this supplemental petition.” In his supplemental petition he made the following allegations:
“That following his discharge as being able to return to. work, your petitioner was examined by Dr. Homer D. Kirgis, prominent neurosurgeon on the staff of the Ochsner Clinic in New Orleans, who .diagnosed your petitioner’s condition as a herniation of the fourth lumbar intervertebral disc with compression of the fifth lumbar nerve on the left, and stated that he is disabled for the performance of the work he had been performing at the time of the injury; that petitioner suffers a traumatic hysteria, is nervous, neurotic and emotionally upset, all of which has the effect of making your petitioner permanently and totally disabled from doing work of any reasonable character.”
While plaintiff, in his amended petition, does not set out with exactness the allegations of his original petition which are in conflict with the amended petition, it seems clear that what he charges in his amended petition is that the actual cause of his disability is post traumatic neurosis and not a rupture of an intervertebral disc as originally alleged. We say this because a careful study of the medical evidence and reports, which obviously must have been in the possession of plaintiff and his several counsel during the more than two years in which no effort was made to bring the matter to trial, indicated that plaintiff had not sustained a rupture of the- intervertebral disc and that accordingly he could not have obtained a judgment had the matter been permitted to go to trial on that issue. It therefore seems clear that when the decision was rendered in Ladner v. Higgins, Inc., supra, it was realized that, though plaintiff could not base recovery in compensation on a ruptured disc, he might possibly be able to persuade the courts that he was suffering from traumatic hysteria and that disability resulted therefrom.
Our conclusion that plaintiff could not have sustained his contention that he had suffered a ruptured intervertebral disc results from an analysis of the medical testimony.
When plaintiff first complained of an injury to his back he was treated by Dr. Geis-mar for about two weeks. Dr. Geismar then strapped his back with adhesive tape and, on June 4th, discharged him as able to return to work. However, before discharging him, Dr. Geismar referred him to Dr. Howard Karr, a neurologist, who, after an examination, reported that he found that plaintiff was not disabled. He said:
“That the patient had no disability as a result of the episode which he described as having occurred four weeks prior to his visit to my office.”
After his discharge by Dr. Geismar, plaintiff, on the advice of his then attorneys, who have since been replaced by his present attorneys, consulted Dr. Homer D. Kirgis, who reported that in his opinion plaintiff had sustained a ruptured disc. He then was sent to the Charity Hospital where extensive examinations and myelograms were made and X-ray photographs were taken. It was concluded that he had no ruptured disc and that there was nothing physically wrong-with him.
He continued to complain and, on July 28, 1952, he was examined by Dr. George Bat-talora, an orthopedic specialist, who found nothing wrong but suggested another neurological examination. In September, 1952, he returned to Charity Hospital where again extensive examinations were made. It was the opinion of the experts at the Charity Hospital that there was nothing wrong with him, and on October 1, 1952, he was discharged with the .diagnosis “malingerer.” However, on the suggestion of Dr. Battalora, on October-6, 1952, he was again sent to another neurosurgeon, Dr. Randolph Page, who reported that from a neurological standpoint he' found nothing wrong with plaintiff. At the end of his rather lengthy testimony appears the following :
“Q. As a result of your examination from the' neurological standpoint, is there anything wrong with this man at all ? A. Nothing.”
*556 He also said that in his opinion the symptoms were “clearly simulated to a large extent.”
During, March, 1953, plaintiff consulted a general practitioner of his own selection, Dr. R. E. Dupre, of Ville Platte, Louisiana, who says that he did “not make any orthopedic examination,” but advised that he see an orthopedist. Apparently, acting on this suggestion, plaintiff consulted Dr. Rufus Alldredge,, who made an examination, but who was not called as a witness and whose findings are consequently not to be found in the record.
In August, 1953, plaintiff consulted Dr. Blaise Salatich, an orthopedic specialist, who reported that he found a ruptured disc. Later, during February, 1954, apparently not satisfied that there was available sufficient evidence to sustain the allegations as to a ruptured disc, plaintiff, at the request of his attorneys, was examined by Dr. Jack Wickstrom, an orthopedic specialist, who examined all of the reports, records, X-ray photographs and myelograms which had been made at the Charity Hospital and advised that plaintiff did not have a ruptured disc nor any organic disease nor any back pathology. Note the following testimony:
“Q. And they were X-ray views of the spine, as well as X-rays, myelo-grams, and there were two myelograms that were made? A. Yes, I believe there was a double set.
. “Q. A double set? A. And the re- . ports were available.
“Q. And you reached the conclusion, after studying the X-rays, that he had no back pathology of an organic basis ? Is that correct? A.' That’s correct,' sir.' ’
“Q. And by back pathology, we are talking also about any ruptured disc? A. We are.
“Q. So that from the study of the X-rays, your findings were entirely negative? A. From my X-rays.
“Q. Yes.”
After referring to the various X-rays, mye-lograms and reports, he stated that his findings were entirely negative.
In April, 1954, on advice of his attorneys, he was sent to Dr. David A. Freedman, a psychiatrist, who reported that he could find nothing organically wrong but who, because of plaintiff’s persistent complaints, thought that he might be suffering from what he termed an “hysterical syndrome.”
It is evident from the testimony of,Dr. Freedman that objectively he found nothing wrong with plaintiff and that his conclusion that plaintiff was suffering- from hysteria was based solely on the plaintiff’s statements to him. Certain of the statements are quite significant. For instance, after explaining certain tests to which he had subjected the plaintiff, although he said that he did not believe that the plaintiff was consciously malingering, he said that there were certain of his complaints “which led to my diagnosis that the pain he complained of and his physical symptoms in general did not jibe-with what I know about anatomy.” He was then asked:
“In other words, he complained of pain when you made him go through a certain maneuver and when you made him go through another maneuver, which should not elicit pain, he complained of pain in the same area?”
And he answered:
“That, among other things, yes.”
And he added:
“ * * * I do not believe that one can differentiate malingering from hysteria on the basis of a clinical examination.”
Dr. Freedman also stated that the plaintiff had complained of a loss of sensation in certain parts of his body, particularly the “entire left side.” He then stated:
“ * * * However, over this anesthetic area it was possible to elicit evidence of sensation by the use of various maneuvers designed to confuse.”
*557 He further said that though the plaintiff complained of tenderness in various locations the pain could be “made to move up the back for a considerable distance, again by suggestion.”
Dr. Freedman was asked whether he would change his opinion that the plaintiff was disabled as a result of traumatic neurosis if it could be shown that he had done some of the things concerning which the detective testified. He gave the following testimony:
“Q. Do you think he could have used a scythe blade cutting grass or moving or doing the type of work which required the use of his arms and his entire,body? A. I think it would have been very difficult for him to do.
“Q. Do you think he could do, say, the changing of tires on an automobile? A. Not from my examination.
“Q. If he could do those things, would you be inclined to believe that he was correctly telling you about his condition during the course of your examination ? A. It would cast a good deal of doubt on my opinion.”
And he finally said that by the application of a pin prick he was able to have the plaintiff, at one time, feel the pin prick in one place when previously he said that he did not feel it. And he said that this was “a very common characteristic finding in hysteria,” and also “in malingering.”
Plaintiff was then sent to Dr. Edmund Connelly, another psychiatrist, who reported that there was nothing wrong with him;, that he had no neurosis, nor nervousness, nor neurotic disease of any kind. He was asked:
“Could you find anything in your examination of this man to support his complaints that he made that he is suffering from an hysteria of any kind, whether traumatic or conversion hysteria ?”
And he answered:
“No, that is what I say in my report.”
He was asked:
“As I understand your conclusion, you could find nothing as a result of your examination which justified the conclusion that this man was suffering from any neurosis, traumatic or otherwise, or call it hysteria, if you will ?
Dr. Connelly answered: “That is right.” He also stated that he could find no reason for the, pain of which the plaintiff complained. He said:
“I cannot see any muscular tremors in the back to indicate pain; I cannot see any limitation of the movement of the muscles; I cannot see any indications that those muscles have deteriorated from disuse; and that is what you have to go by. Nobody knows what pain the man has. He might have almost any kind; but on the other hand, if you have all that pain, there ought to be some indication of it when you are dealing with him.”
It thus appears that in spite of the findings of Dr. Kirgis and Dr. Salatich the record overwhelmingly demonstrates that from an organic physical standpoint there was nothing wrong with plaintiff’s back.
The opinions of Dr. Kirgis and Dr. Sala-tich are substantially outweighed by those of Dr. Geismar, Dr. Karr, the doctors at the Charity Hospital, Dr. Battalora and Dr. Page. And while it is shown that Dr. All-dredge did not testify because plaintiff could not pay him the fee he demanded, it is a fair assumption that the findings of Dr. Alldredge must have been unfavorable to plaintiff since his testimony was not taken.
When all of these examinations apparently indicated that plaintiff, in all probability, could not recover under the charge that he had sustained 'a ruptured in-tervertebral disc, it seems obvious that the change in plaintiff’s position resulted from our decision in the Ladner case in which, *558 as wé háve already stated, we held' that even in the absence of physical injury there may be recovery where disability results-from actual post traumatic neurosis. It was then that plaintiff filed his supplemental petition focusing- his attack on the possibility that he had sustained a post traumatic neurosis which completely disabled him.
We have no doubt that an employee who is thus really disabled as a result of post traumatic neurosis is as fully entitled to compensation as is an employee who sustains physical disability. However, in such a case the evidence must be carefully scrutinized because of the fact that compensation neurosis is so closely akin to post traumatic neurosis that the very faint line between them is so indistinct that it is extremely difficult to determine on which side of the line each particular case should be placed. We recognized this in the Ladner case, saying [71 So.2d 245]:
“We are fully cognizant of the caution which we must exercise in a case of this nature, in view of the nebulous characteristics of a neurosis.”
Our attention is directed by counsel for defendant to the remarkable similarity which exists between the chronology of this case with that which appeared in Phelps v. Royal Indemnity Company, La.App., 77 So.2d 225. In that case the plaintiff originally contended that he had been permanently disabled as a result of a physical injury,- which included the rupture of an in-tervertebral disc. During the trial of the case; the District Judge asked what was the nature of the injury of which plaintiff complained and then said:
. “ ‘Is there any issue of post traumatic neurosis ?’ ”
and counsel for plaintiff answered:
“ ‘No, sir, claim was ruptured inter-vertebral disc.’ ”
When the evidence, as it developed, indicated that there was no ruptured disc plaintiff attempted to shift his position and contended that the disability resulted from post traumatic neurosis. We said:
“We cannot -overlook the very significant fact that during the entire first trial no mention was made of post-traumatic neurosis except that it was said that there was no claim that plaintiff had sustained any such neurosis and that his entire case was based on the contention that he had suffered a ruptured intervertebral disc. * * * ”
That same situation exists here. There was no suggestion of post traumatic neurosis until we rendered our decision in the Ladner case.
When we come to consider carefully the evidence concerning post traumatic neurosis we first notice several statements of plaintiff himself, any one of which is in itself of no great importance but which together seem to indicate an attempt on the part of the plaintiff to make it difficult for the courts to ascertain the true facts. In tire first place, we notice that in his petition he alleges that as he “pulled back forcefully,” on a pick which was under a concrete block, he suffered a sharp pain in the center of his back. He made no reference to a fall. Yet in his testimony he stated that his back was hurt as a result of a fall to the ground.
When he made a statement to an adjuster as to the facts he' made no mention of a fail and he also failed to mention any fall to at least two of the doctors who examined him and, to another doctor, he merely said that he had wrenched his back. Fellow employees who were with him at the time say that he did not fall but merely said that he had hurt his back. His employer said that the plaintiff said nothing to him about a fall. Another statement to plaintiff which we notice is that he testified that he had never made any previous claim for compensation, yet when it developed that he had previously received compensation for an earlier accidental injury, he attempted to explain that he had received compensation but had never received any lump sum *559 settlement. Furthermore, he stated that since , this accident, he had not been able to do anything at all. He says that he cannot even sweep the floor, yet a detective who was employed to shadow him for some time saw him cutting grass for about two hours and also saw him change tires on an automobile.
When it was shown that he had been seen cutting grass, he admitted that he had done so, but stated that it had been for only a very short time. When, it appeared that he had been seen changing tires, he said:-
“I might have did. I ain’t goin to say I didn’t. I ain’t goin to say I did. I might have did.”
We thus find an able bodied laborer, 29 years old, having no organic physical reason for not being able to work, claiming that, because of traumatic neurosis, he is totally unable to do work Of any character at all and making false and contradictory statements as to his condition and the cause of it.
Under these conditions it would require a substantial preponderance of the expert evidence to convince us that the plaintiff is actually suffering from a nervous condition which renders him totally, permanently disabled.
There is a report in the record from the Charity Hospital which gives details as to the examinations which were made and which includes the statement: “It is our impression that the man is a malingerer.”
The lay testimony as to plaintiff’s condition comes from relatives and neighbors and is, we think, heavily outweighed by the expert evidence to the effect that he has no physical injury and no neurosis which prevents his doing the kind of work in which he had been engaged prior to the accident. Of the two psychiatrists, Dr. Freedman’s testimony is based almost entirely on his reliance on the statements made by the plaintiff, whereas the opinion of Dr. Con-nelly is based on tests to which he subjected the plaintiff and which led him to ,the conclusion that plaintiff was not suffering from nervousness or neurosis of any kind.
Our conclusion is that the plaintiff is not disabled. Consequently the judgment appealed from is annulled, avoided and reversed and plaintiff’s suit is dismissed at his cost.
Reversed.