231 So.2d 678 (1970)
Joseph H. JORDAN, Plaintiff-Appellant,
v.
The TRAVELERS INSURANCE CO. et al., Defendants-Appellees.
No. 7880.
Court of Appeal of Louisiana, First Circuit.
February 2, 1970.
Rehearing Denied March 9, 1970.
*679 Ronald A. Curet, Hammond, for appellant. Duncan S. Kemp, III, Hammond, for appellees.
Before LANDRY, SARTAIN and ELLIS, JJ.
SARTAIN, Judge.
In this opinion we are not concerned with liability. The trial judge found that the accident giving rise to this litigation was the result of the negligence of an employee of one of the defendants. Accordingly, the issue before us is one of causation, that is whether or not the accident caused injuries to plaintiff to the extent claimed by plaintiff.
In his petition, plaintiff alleged that as a result of the accident he had sustained an organic brain syndrome consisting of a number of items, principally post-traumatic psychosis which resulted in very serious psychiatric disorders. He also alleged that he had sustained a severe cervical neck sprain (whiplash).
The trial judge found that the proof adduced by plaintiff in support of the alleged injuries was only sufficient to prove that the whiplash injury was the result of the accident. Accordingly, he awarded plaintiff the sum of $6,500 for personal injuries and $2,236.16 for special damages. Plaintiff has appealed devolutively and urges that the trial judge erred in failing to hold that the post-traumatic psychosis and resulting mental difficulties were caused by the accident. Defendants answered the appeal contending that the award of $6,500 for the type of whiplash injury sustained by plaintiff is excessive. Defendants also *680 complained about the award of special damages.
We are of the opinion that while the trial judge was correct in finding that the whiplash injury was the result of the accident, he committed manifest error in holding that plaintiff had failed to prove that the serious psychiatric disorders were also the result of the accident.
The accident which precipitated this litigation occurred at approximately 12:55 P. M. on April 23, 1965 in Hammond, Louisiana, at the intersection of U.S. Highway 51 and West Church Street. Plaintiff was driving his vehicle in a southerly direction on U.S. Highway 51 and was struck from the rear by a Coca-Cola truck as plaintiff applied his brakes preparatory to stopping for a red light at the intersection.
It is not necessary that we discuss separately the contention raised by defendants in their answer that the award of $6,500 for the whiplash injury is excessive. As stated above, we are of the opinion that plaintiff also sustained serious mental residuals as a result of the accident. These mental disorders manifested themselves while plaintiff was being treated for and before he had actually recovered from his whiplash injury. Under these circumstances we deem it wiser not to make separate awards for each type of injury but to consider the totality of plaintiff's injuries and make one award therefor. We will, however, discuss the question of specials at a point later in this opinion.
The disposition of cases pertaining to mental residuals, whether involving a psychosis or a neurosis, is usually difficult and the instant matter is no exception. There are, however, several factors in the case at bar which bear heavily on the result reached by us. One such factor is that prior to the accident plaintiff, though sixty years of age, was an active and productive individual. He was a journeyman carpenter and followed this trade regularly. In addition, he assisted his wife in the operation of a retail bakery business. He was a typical family man, assisted his wife in the rearing of her children by a previous marriage and their own young daughter. The one exception to an other wise perfect health picture is that on one occasion three years previously, he thought he had heart trouble and applied for social security retirement benefits. These benefits were denied him on the basis of a negative report from his then attending physician. There is not one scintilla of lay evidence in this record to give the slightest indication that plaintiff would ultimately suffer the mental residuals which began to manifest themselves shortly after the accident. The lay testimony as to plaintiff's prior good health, home life and work habits remains undisputed.
Before we consider the testimony and diagnoses of the doctors, it may be helpful if we list the dates and places of plaintiff's hospitalization, starting with the date of the accident on April 23, 1965. He was first taken to Lallie Kemp Charity Hospital in Independence. Shortly after he arrived there he was met by his wife who moved him to the Seventh Ward General Hospital in Hammond, Louisiana. He remained confined there until May 4, 1965, a period of eleven days. On May 18, 1965 he was confined at St. Tammany Parish Hospital until June 2, 1965, a period of fifteen days. On June 2, 1965 his wife attempted to place him at Ochsner's Clinic in New Orleans. Admission at Ochsner's was refused him.
On June 12, 1965 he was hospitalized for several days at the Southern Baptist Hospital in New Orleans. Then on June 15, 1965 he was placed in Southeast Louisiana Hospital at Mandeville on a voluntary commitment. He remained at Mandeville through August 8, 1965 or just four days short of two months. During the confinement at Mandeville he was sent to the Charity Hospital in New Orleans, Louisiana and remained there from June 30, 1965 through August 4, 1965. After his release from Mandeville he was seen at regular intervals at the Hammond Mental *681 Health Center. His mental condition worsened and when he refused voluntary recommitment to Mandeville his wife and family had him committed through the coroner. This occurred on May 26, 1967 and he remained at Mandeville until July 16, 1967. From his last release from Mandeville and up to the date of the trial plaintiff was again seen on a regular basis at the Hammond Mental Health Center.
The documents that comprise the record before us contain copies of hospital records, doctors notes, social summaries, and other medical data relative to plaintiff's confinement and treatment at each of the hospitals listed above.
Significantly, only three experts gave testimony on the merits, namely, Drs. Feder, Sneed and Hill.
Dr. Feder, a general practitioner, was not available to testify at the trial but the matter was laid over for the taking of his deposition. On the first occasion that this was done, the recording machine broke down and the stenographic notes did not permit an accurate transcription of all of his testimony. This was later accomplished at a subsequent deposition. Dr. Feder testified that when he first saw plaintiff in the emergency room at the Seventh Ward General Hospital, plaintiff was suffering acute pain in the nape of the neck, the chest and mid-back. He explained that plaintiff seemed to him to be in shock but otherwise in good shape though "he was confused and claimed to have been rendered temporarily unconscious" by the accident. He also complained of headaches and dizziness. The doctor observed no bruises or contusions about the plaintiff's head or forehead. The doctor's provisional diagnosis was "neck sprain, probably whiplash, a concussion to the brain, a contusion of the chest". The doctor later ruled out concussion and determined that Jordan had sustained a whiplash injury. He then commenced treatment with narcotics, and later muscle relaxants, analgesics, sleeping pills and traction. He continued to treat plaintiff at his office from May 4 to August 17, 1965. Between these dates and particularly on the last date he noticed that plaintiff had began to show signs of mental frustration. Plaintiff had stated to him that other persons, including members of his family, were trying to harm him. This was the first occasion that any doctor had observed conduct on the part of plaintiff that would indicate some mental disorder. When asked what significance this had for the doctor, he answered that it convinced him that he had released plaintiff from the hospital too quickly. Dr. Feder stated that while he treated plaintiff in the hospital in Hammond he found him to be a most cooperative and willing patient. He stated that he released him only at the instance and urging of plaintiff because plaintiff wanted to return to his work. Dr. Feder did not have any occasion to see plaintiff after the office visit on May 17, 1965. When asked if he had an opinion as to the nature and origin of plaintiff's mental problems, Dr. Feder stated that he would defer this question to the experts.
The record reveals that plaintiff's condition worsened and he was taken to the St. Tammany Parish Hospital and according to plaintiff's own testimony, he received treatment by Drs. Kety and Rodwig.
While at the St. Tammany Parish Hospital plaintiff became a severe behavior problem. The doctors there recommended his commitment to Southeast Louisiana Hospital. Mrs. Jordan declined to follow this advice and instead took plaintiff by ambulance to the Ochsner's Foundation in New Orleans. According to her testimony they declined to accept her husband as a patient because they were of the opinion that his problems were mental. Drs. Kety and Rodwig were not called to testify.
Plaintiff returned home and when his condition failed to improve, he was taken to the Southern Baptist Hospital in New Orleans and while there was given psychiatric, physical and neurological examinations.
*682 The doctors at the Southern Baptist Hospital recommended that Mrs. Jordan place her husband at Mandeville. These doctors were not called to testify.
Plaintiff was then voluntarily committed to Southeast Louisiana Hospital at Mandeville, Louisiana. While there he was examined, treated and his condition diagnosed by Drs. Gary Sneed and L. Wayne Hill. These were the remaining two experts mentioned above who testified in this cause. Uniquely, plaintiff and defendants base their respective cases on the testimony of these two doctors.
The records of the hospital indicate that when plaintiff was initially admitted he was assigned to Dr. Hamm. Dr. Hamm left shortly thereafter and plaintiff's case was then assigned to Dr. Sneed. Dr. Sneed testified that he diagnosed plaintiff's condition as "chronic brain syndrome associated with trauma and cerebral arteriosclerosis with psychotic reaction". He stated that his diagnosis was based upon two principal considerations, namely, that the plaintiff had been in an automobile accident which had rendered him unconscious and that prior to the accident plaintiff had been working and functioning in a normal fashion in contrast to a marked and severe personality change immediately following the accident. Dr. Sneed did not delve into the length of time plaintiff was supposedly rendered unconscious by the accident. He stated that chronic brain syndrome is physical damage to some part of the brain and can be caused by trauma, arteriosclerosis, tumor, certain presenile diseases, alcoholism and other causes. The doctor further stated that in plaintiff's case he was able to rule out by neurological consultation all causes but trauma and arteriosclerosis. He placed particular significance on the trauma because he was of the opinion that a whiplash injury did not usually bring on mental disorders to the extent endured by plaintiff. The doctor steadfastly stood by his diagnosis that plaintiff's condition was a combination of trauma and arteriosclerosis.When asked if he could separate the two conditions as to cause and result he stated:
"I cannot honestly say that I could say that this is all due to trauma, nor can I not say that some of it is due to trauma. I think that Mr. Jordan could well have had arteriosclerosis that could have aggravated this and caused it to advance severely. After all he had acute psychotic entrained episode closely related to trauma."
Dr. Sneed was able to observe plaintiff during his first confinement at Mandeville and also when he was again committed two years later. While plaintiff was at Mandeville the first time he developed a physical disorder that called for a neurological examination. For this examination he was referred to the Charity Hospital in New Orleans and there was seen by Dr. Hill, who at the time was associated with the Department of Neurology at the Charity Hospital.
Dr. Hill testified that the neurological examination by him of plaintiff at the Charity Hospital revealed that there was brain damage but that he could not say whether or not this brain damage was caused exclusively by the accident or was the result of other factors. In August of 1965 Dr. Hill, as a consulting psychiatrist, saw plaintiff at Mandeville. Considering the then available information at Mandeville together with his own neurological findings of the examination at the Charity Hospital in New Orleans, Dr. Hill tentatively diagnosed plaintiff's condition as one of three possibilities, early senile changes, possible focal vascular accident (stroke) and post-traumatic brain damage. The doctor placed a "?" behind the diagnosis of post-traumatic brain damage. His further impression at that time of plaintiff's condition was "traumatic precipitation of an involutional paranoid psychotic reaction". Plaintiff responded to treatment and was released from Mandeville on August 8, 1965 with the recommendation that he receive out-patient treatment at the Hammond Mental Health Center.
*683 Dr. Hill also served as a consultant to the Mental Health Center at Hammond and in this capacity saw plaintiff on a regular month to two months basis for a period of two years. When plaintiff's condition took a turn for the worse in May of 1967, Dr. Hill recommended a coroner's recommitment of plaintiff to Mandeville. On plaintiff's subsequent release from Mandeville on July 16, 1967, he was again followed up and seen on a regular basis by Dr. Hill. The doctor was asked for his opinion as an expert neurologist and psychiatrist and testified as follows:
"Q: Now considering your over-all view of this patient as a neurologist and as a psychiatrist have you formed an opinion as to the diagnosis of his case?
A:Yes.
Q:What is that?
A: Well, I see him now as a man who has brain damage who is intellectually and physically limited because of this, and who also suffers from a reactive depression because of his brain damage plus some psychotic ideations as a result of his concern about his limitations.
Q: And again considering the sum total of your observation and treatment of this patient are you able to give an opinion as to the cause of this limitation?
A: Well, now I feel that his trauma is responsible for his brain damage."
The most serious point of dispute between counsel for plaintiff and counsel for defendants concerns the history of the accident and plaintiff's condition thereafter and the part this history played in the diagnosis expressed by Dr. Hill. One hospital case note reveals that the accident rendered plaintiff unconscious for a period of thirty to forty minutes. Hence, counsel for defendants argues that if this information is wrong then the diagnosis based thereon must also fall. Plaintiff denies telling Dr. Hill or any other person that he was unconscious thirty to forty minutes. This information was undoubtedly obtained from members of plaintiff's family. All statements made by plaintiff on this point to any doctor indicate that plaintiff stated that he was rendered temporarily unconscious. The evidence in the record clearly preponderates to the conclusion that plaintiff was stunned and rendered unconscious for only a period of five to ten minutes. Dr. Hill, when confronted with this change of basic facts, i.e., that plaintiff was unconscious not thirty to forty minutes but five to ten minutes, stated that it would not change his diagnosis but would only lead him to the conclusion that plaintiff had a previously diseased brain that caused his present condition which was "precipitated by trauma causing a further injury".
We say categorically that the hypothesis given to Dr. Hill by defendants' counsel that plaintiff was involved in a minor accident, slightly struck, was only rendered unconscious for two to three minutes, was then able to discuss coherently with the investigating officer the circumstances of the accident, all within a period of three or five minutes is completely contrary to the clear preponderance of the evidence in the record. This hypothesis apparently was accepted by the trial judge as constituting the basic facts upon which the experts should have formed their opinion.
First, it was not a minor accident involving a slight impact between the two vehicles. When plaintiff's car was struck from the rear, it was propelled across the intersection and came to rest on the southwest corner thereof. It is true that the damage to plaintiff's vehicle was minor; however, physical damage does not in itself determine the extent of injuries that may be sustained by an occupant of a vehicle.
The first person to reach plaintiff after the collision was Mr. William Louk. This witness did not see the accident but recognized plaintiff's vehicle over on the side of *684 the road with plaintiff slumped over the steering wheel. When he reached plaintiff, he shook him and plaintiff appeared to regain consciousness though he was still "groggy". He then left plaintiff's side to go to a nearby phone to call Mrs. Jordan. By the time Mr. Louk returned, an ambulance had arrived and plaintiff had been placed in it.
Mr. Klein, the driver of the Coca-Cola truck, stated that plaintiff's vehicle after the impact did proceed across the intersection. When he observed several other persons running to plaintiff's vehicle, Mr. Klein then went across the street to call the police. When he returned, the ambulance had arrived. Plaintiff then got out of his car and was placed in the ambulance. This witness estimated that from the time of the collision until he returned back to plaintiff's vehicle no more than eight to ten minutes of time had elapsed.
Chief H. B. Robinson of the Hammond Police Department stated that when he arrived plaintiff was standing outside of his vehicle conversing with some other people. He explained that he spoke to Mr. Jordan who answered him in a very coherent manner and explained to him how the accident happened. He did state that Mr. Jordan complained of pain across the neck and shoulders. Chief Robinson stated further that the Jordan vehicle was just a "little distance" in front of the Coca-Cola truck.
The trial judge, while noting the discrepancies between the testimony of Chief Robinson on one hand and Messrs. Louk and Klein on the other, concluded that such discrepancies did not "discredit or render suspect" the testimony of Chief Robinson. While this is a matter of weight to be accorded testimony of witnesses, we see nothing in the record to "discredit or render suspect" the testimony of Mr. Louk and Mr. Klein. Klein in particular was a co-defendant. It is clear to us that when Chief Robinson arrived, Mr. Jordan was not standing outside of his vehicle, was not discussing the accident in a clear coherent manner, and was in much greater difficulty than the officer perceived. This witness did note on his accident report that plaintiff did complain to him of being rendered momentarily unconscious.
Further corroboration of plaintiff's testimony concerning the severity of the impact between the vehicles and his period of unconsciousness as testified to by Mr. Louk is the testimony of Dr. Feder, who saw plaintiff at the Seventh Ward General Hospital and stated that at that time plaintiff was in acute pain, a state of shock and confused.
We now turn our attention to the crucial issue in this instant matter and that is whether or not the negligent act of the defendant also brought about the subsequent mental residuals endured by plaintiff. For plaintiff to recover for these injuries he must establish that there is a causal relation between the two and that the injuries complained of did in fact result from the accident. In shouldering this burden of proof, probabilities and possibilities are not enough; however, neither is plaintiff required to prove this causal relation beyond a reasonable doubt. The amount of proof required, therefore, involves a question of degree. The answer thereto is one of reasonableness. This is so because not all injuries are susceptible of proof by testimony that is beyond legitimate quandary. It is for this reason that our jurisprudence has provided that the legal requirement for the burden of proof is satisfied when plaintiff has established to a reasonable certainty that the negligent act caused his injuries. To prove less is not enough but to require more would make a plaintiff's task an unreasonable one and in many cases impossible. Considering the above related testimony, both expert and lay, we find that the plaintiff has established to a reasonable certainty that the mental disorders sustained by him were caused by the accident.
*685 The case of Peppers v. Toye Bros. Yellow Cab Co., 198 So. 177 (Orl.App., 1940) contains facts apposite to those in the instant matter with particular reference to a sudden change in personality closely related to trauma. The opinion, authored by then Judge but now Mr. Justice McCaleb, contains the following statement:
"* * * the courts have adopted the view that, where a person who enjoys good health suffers an accident and within a short time thereafter a dormant preexisting illness or old injury disconnected with the accident flares up or becomes active, it will be presumed that the flare up was not a coincidence and that it was set in motion as a direct result of the accident. And it is sufficient for the plaintiff, in order to cast the burden of proof upon the defendant, to show by medical testimony that there is a reasonable possibility that the result claimed for did happen."
The Peppers case is quoted with approval in Kline v. Columbia Casualty Co., 155 So.2d 82, 83 (2d La.App., 1963) and is supportive of the result reached by us in the case at hand. In Kline it was held that expert evidence sufficiently supported lay testimony to the effect that plaintiff was noticeably affected by and his physical condition substantially deteriorated after the accident.
In Causey v. Kansas City Bridge Co., 191 So. 730 (1st La.App., 1939), a workman's compensation case, the question was whether or not the industrial accident sustained by plaintiff bore a causal relation to plaintiff's death as a result of a cancerous growth. The court observed that prior to the accident plaintiff had been a vigorous, active and hardworking laborer which facts strengthened the conviction of the medical experts that the blow or strain received by plaintiff could have aggravated or activated the dormant cancerous growth.
In Humphries v. Delta Fire and Casualty Co., 116 So.2d 130 (1st La.App., 1959) medical and lay testimony justified the conclusion that plaintiff's sudden personality change was a result of a neurosis precipitated by the accident. Admittedly in this case, plaintiff received severe abrasions and contusions about the left half of her forehead.
Barlow v. Plummer, 195 So.2d 321 (3d La.App., 1967) cited with approval the Allen and Humphries cases. Again in Barlow, the question was aggravation of a pre-existing mental condition.
The recent decision of Caracci v. Christiana Bros. Poultry Co. of Gretna, 212 So. 2d 509 (4th La.App., 1968) reflects that the court while viewing the testimony of psychiatrists with suspicion, nevertheless held that it had to accept the conclusion reached by the two psychiatric experts that the accident aggravated "some pre-existing dormant mental condition" in the plaintiff.
Not all cases involving either a psychosis or neurosis have had easy going. There still exists the rule as expressed in Hicks v. Royal Indemnity Company, 80 So.2d 553, 558 (Orl.App., 1955) that evidence of a post-traumatic neurosis based on symptoms that do not manifest themselves in point of time close to that of the trauma must be carefully scrutinized and viewed with caution. See also Ladner v. Higgins, 71 So.2d 242 (Orl.App., 1954).
Now to the case at hand we note that the mental disorders experienced by plaintiff manifested themselves within the month following the accident. This feature coupled with the unrebutted testimony of plaintiff's prior good health is one of the crucial factors previously mentioned by us.
The other factor which bears heavily on our decision is that only two experts testified, both on behalf of the plaintiff. Their testimony is clear to the effect that the accident either caused plaintiff to sustain a post-traumatic psychosis or precipitated a pre-existing condition of arteriosclerosis, either one of which brought about his psychotic behavior.
*686 Defendants rely very heavily in their argument that plaintiff's refusal to call other doctors who treated, examined or diagnosed his condition creates a presumption that their testimony would be unfavorable to his case. This is a proper assumption; however, the assumption itself may be rebutted. We are of the opinion that the testimony of Drs. Sneed and Hill clearly rebuts any presumption against plaintiff's cause for his failure to call the other doctors.
When plaintiff produced Drs. Sneed and Hill who expressed the expert opinion that plaintiff's condition was the result of the accident, the burden of proof then shifted to the defendants, who, in our opinion have not adequately rebutted such testimony.
We now turn to the question of special damages and note that the specials awarded to plaintiff by the trial judge totaling the sum of $2,236.16, included only such medical expenses incurred by plaintiff during the year 1965. Specifically excluded were expenses incidental to plaintiff's second commitment at Mandeville and drugs purchased by him after December 31, 1965. These additional expenses which we think plaintiff is entitled to are $564.00 for confinement at Mandeville from May 26 to June 16, 1967 and $386.10 for drugs purchased after December 21, 1965 up to the date of the trial.
With respect to the award of special damages, defendants contend that the trial judge erred in awarding plaintiff damages for medical expenses incurred in 1965 at the Southeast Louisiana Hospital, Mandeville, Louisiana and Charity Hospital of Louisiana, New Orleans, Louisiana. He cites as authority L.R.S. 46:11 et seq. It is defendants' position that these sums can only be recovered by the institutions themselves and then by way of intervention. The cases of Ledbetter v. Hammond Milk Corp., 126 So.2d 658 (1st La.App., 1961) and Elmore v. Employers Liability Assurance Corp., 173 So.2d 34 (4th La. App., 1965) are contrary to defendants' contentions. In both of these cases it was held that where the plaintiffs actually proved that they had received the services rendered and the bills for such services, they could include in their petitions a claim for past medical expenses and could receive judgment for the amounts owed. This does not prejudice the rights of the institutions to recover from the plaintiff these sums even though the institutions were not made a party to the litigation nor intervened therein.
We now turn to plaintiff's claim for loss of past and future earnings. Plaintiff, a journeyman carpenter, usually worked out of his local union. At the time of the accident he was employed by Mr. Evans at an hourly scale of $2.50 which gave him a weekly wage of $100.00. However, plaintiff did not show the full extent of his earnings for the first part of 1965 or his previous year's earnings, nor did plaintiff show how long his job with Mr. Evans would have lasted.
An injured workman is entitled to receive loss of earnings that have accrued up to the time of the trial and for future loss of earnings after the trial. However, it is plaintiff's burden to prove this loss with reasonable certainty. The general rule is that plaintiff is not required to prove such loss with mathematical exactness, but may show through other means, as for instance his actual earnings during the previous year, what he would have earned during the period of disability. Stevens v. Dowden, 125 So.2d 234 (3d La.App., 1960). While recognizing that in some instances corroborative evidence is not available, the cases generally deny plaintiff's claim for loss of earnings where corroborative evidence, such as income tax returns or employment records is available such evidence was not placed in the record. Fontenot v. Grain Dealers Mutual Insurance Co., 170 So.2d 513 (3d La.App., 1965, writs refused, 1965) involves a fact situation very similar to the case at bar. There a journeyman carpenter showed that he *687 was earning $3.50 an hour for a forty hour week. He was only awarded loss of earnings for two months because the evidence introduced during the trial showed that the job on which he was working at the time he was injured would have lasted for only two more months. The plaintiff therein was denied loss of earnings for the remaining two years of his disability. See 15 Am.Jur. 499 Verbo Damages, Section 89.
With respect to plaintiff's claim for future medical expenses, we also conclude that plaintiff has failed to show with reasonable certainty what these expenses will be. The only evidence on this point is the testimony of the doctors that plaintiff's condition will not improve and that at some distant date it may be necessary to place him in a nursing home where he can receive twenty-four hour attention. This testimony does not support an award for future medicals.
Lastly, we turn to the question of quantum for plaintiff's past, present and future physical and mental pain and suffering. Plaintiff was injured on April 23, 1965 and while he ultimately recovered from his whiplash injury his mental residuals have persisted with increasing severity. During the two years between the accident and the date of the trial plaintiff had been confined to a mental institution on two occasions, totaling three and one half months. The record is amply clear that he will never be able to return to nor enjoy the benefits of a natural and normal life. Considering all of the evidence and in an effort to do substantial justice under the circumstances we believe that he is entitled to an award as damages for such injuries in the amount of $31,500.00. See Faslund v. Kendrick, 169 So.2d 276 (1st La.App., 1964) and Allen et ux. v. Indemnity Insurance Company of North America, 137 So.2d 110 (3d La.App., 1962).
Accordingly, for the above and foregoing reasons the judgment of the district court is amended to increase the award for from $6,500 to $31,500 and to increase the award for special damages from $2,236.16 to the sum of $3,186.26, together with legal interest thereon from date of judicial demand until paid. In all other respects the judgment of the district court is affirmed at defendants' costs.
Amended and as amended affirmed.