BOUTALL, Judge.
This is a suit for personal injuries suffered by plaintiff when the taxicab he was operating was struck in the rear by a vehicle owned by Turnbull Cone Baking Company of Louisiana and insured by Fireman’s Fund American Insurance Companies. Trial before a jury resulted in a verdict in favor of plaintiff by a vote of 10 to 2 awarding him $38,200.00, of which $3,-200.00 represented special damages. The defendants paid the amount of the special damages, and appealed suspensively from that portion of the judgment awarding plaintiff $35,000.00 for pain, suffering and loss of earnings. Thus, the sole issue herein is whether the $35,000.00 awarded plaintiff should be reduced.
The facts are these. At the time of the accident, plaintiff, Ignatius Nuccio, was a forty (40) year old man employed as a captain in the New Orleans Fire Department with fifteen (15) years of service. As a needed income supplement, he owned a Checker Cab and operated it in his off duty hours. On March 6, 1968, his stopped vehicle was struck in the rear by the defendant’s truck.
At the scene of the accident, Mr. Nuccio experienced immediate nausea, headaches, blurred vision, stiffness in the back of the head and neck, extreme nervousness and sharp pains in the left chest. In general his complaints were substantiated by the testimony of the police officer who investigated the accident and who noted Mr. Nuccio’s evident distress. The police drove plaintiff to the nearby business place of a friend, Mr. George Dawson, whose testimony also corroborated the plaintiff’s condition.
Plaintiff then sought treatment from his physician, Dr. James T. Nix, who is also the physician for the New Orleans Fire Department. Dr. Nix noted that plaintiff *803 was complaining of pains in the muscles of the neck and shoulder, and upon examination felt spasm in the trapezius muscle. He concluded that the plaintiff was suffering a cervical sprain and requested an X-ray of his neck, and placed him under a course of treatment, putting him on sick leave from the fire department temporarily. Two days later the plaintiff returned to Dr. Nix complaining of pains in the chest which began the previous day, which caused the doctor to suspect that plaintiff may have suffered some injury causing angina pectoris. After the preliminary tests and examinations were concluded, Dr. Nix was of the opinion that plaintiff “had a cervical sprain with a history of traumatic onset and he had a lumbar sprain with a history of traumatic onset He further stated that “he had coronary artery disease, with a clinical picture of angina in relationship to the trauma — the relationship of the trauma was undetermined.” By this time, Dr. Nix placed the plaintiff on occupational sick leave for a longer period and prescribed a course of treatment which involved the use of a cervical collar, physiotherapy neck traction, muscle relaxants and nitroglycerin for relief of anginal pains. He continued to be concerned about the chest pains and took serial electrocardiogram studies, together with X-ray and blood chemistry studies of the plaintiff and finally in July, 1968, he referred Mr. Nuc-cio to Dr. S. E. Greenberg, an internal medicine specialist.
Dr. Greenberg first saw Mr. Nuccio in July of 1968, for a complete examination and evaluation in relation to his chest pains. Although Dr. Greenberg concluded that plaintiff had severe chest pains he felt that Mr. Nuccio did not have heart disease. He noted however that there was an abnormality in the electrocardiogram, specifically that he had “elevated ‘S.T.’ segments across his lateral pericardium.” The doctor was concerned because it was his medical experience that this is the area where heart attacks do occur. The doctor felt that it was too early to definitely exclude any kind of heart injury or unlying cardiovascular disease, so he began treating him and requested him to return later to be reevaluated. He was reevaluated at a later date and Dr. Greenberg concluded that the abnormality in the electrocardiogram was caused by a congenital condition. Dr. Greenberg felt that the pains which the plaintiff had could be explained on several bases, for example: (1) Plaintiff could have struck his chest on the steering wheel and was still suffering the effects of the blow, (2) Anxiety, excitement, anger, can cause chest muscles to tighten and cause pain, and (3) That these muscles and spasms can be continually aggravated by normal activity and never allowed to heal.
The opinion of Dr. Greenberg is at variance from the opinion of Dr. Nix, who stated that he felt that Mr. Nuccio did in fact have heart disease, but deferred to the opinion of Dr. Greenberg, who was a specialist, and so he permitted the plaintiff to return to work on Dr. Greenberg’s advice. Both doctors explained that the diagnosis of angina pectoris poses difficulty and that to some extent it is really a decision of the individual physician. Both doctors testified that it was difficult to diagnose in every case coronary artery insufficiency unless the patient is experiencing the onset of angina at the time of the examination. In any event, however, Dr. Nix permitted the plaintiff to return to work, and he apparently had experienced no particular problems in that regard up to the time of trial.
However, the plaintiff has continued to experience difficulty with his neck and shoulder as a result of the accident. Dr. Nix had prescribed the usual conservative course of treatment for the cervical sprain, and while it is obviously less severe than at its inception, nevertheless, it still continues to give considerable difficulty to plaintiff in his occupation and activities.
Dr. Nix treated plaintiff’s neck for about eight (8) months until November, 1968. Plaintiff was anxious to return to work and after six (6) weeks prevailed upon Dr. Nix to allow him to do so. Although he has worked since that time, it is *804 obvious that he continued to do so with considerable pain. When he was discharged from treatment by Dr. Nix, the doctor felt that Mr. Nuccio had reached a maximum recovery and that he could offer him no further treatment. He found at that time that Mr. Nuccio had restriction of motion of his neck such that it amounted to approximately two-thirds (2/3) of normal rotation to the right and some slight restriction of rotation to the left. He rated plaintiff as having a 25% disability to the body due to the neck injury. While he felt that plaintiff could return to his job and do it properly, nevertheless, because of this restriction in motion the plaintiff would not be able to perform his duties as quickly as before and would suffer pain and discomfort while performing these duties incident to his employment. Because this condition existed through his last examination in December of 1969, some twenty-one (21) months post-accident, Dr. Nix felt that the disability had remained constant and would continue to do so for a period of about ten (10) years. Thereafter it would intensify due to the aging process and give plaintiff additional problems.
Plaintiff was also examined by a Dr. H. R. Soboloff, an orthopedic surgeon. Dr. Soboloff concluded that plaintiff had no problems except in his neck, where he could discern some muscle tightness. His examination revealed that there was no restriction of motion in the neck, forward or back, but there was restriction of motion to the right. He felt that plaintiff could only accomplish motion to the right of some 70-75 degrees out of a normal 90 degree range. Like Dr. Nix, Dr. Soboloff felt that the tightness and restriction of rotation was a residual from the accident and had stabilized, so that there was no further medical treatment available to improve plaintiff’s condition. This doctor also concluded that it was consistent with his findings that the plaintiff would suffer discomfort from his work as a fire department captain and as a taxicab driver. There is little difference between the testimony of the two doctors, except for the difference in degree of disability as a result of the injuries suffered.
The testimony of the plaintiff is that he has suffered considerably from pain and discomfort since the accident. His usual occupation is that of a captain at the Central Fire Station located at 317 Decatur Street, New Orleans. He served in two capacities: A house captain and captain in charge of the hook and ladder unit. As house captain he is the administrative officer and as such he must do a considerable amount of paper work. He is required to account for and report all of the activities of the station, including both men and materials. Additionally, because he is in charge of the hook and ladder unit, he is required to attend fires and direct the operation of that unit in combating fires. In this capacity he is required not only to direct the men, but also to engage in the numerous physical activities that the men themselves engage in, and often to lead them in combating the fires. Additionally, because his unit is a hook and ladder unit which entails the hoisting and safe-placing of the ladders for rescue, ventilation of the building for fire fighting purposes, and sometimes shifting men about to actually combat the fire, it is necessary that he move his head about quite a bit, thus affecting his neck. It is unfortunate, of course, but his activities thus require him to sit relatively immobile for long periods of time while doing the paper work, and on the other hand, necessitates the extreme use of his neck and shoulder muscles while on duty combating fires. Similarly, he suffers discomfort whenever he engages in drills with his men or recreational activities.
The problems that Mr. Nuccio experiences as a fire captain are amply borne out by the testimony of several of the men who work with him and who have observed him over long periods of time. On numerous occasions he has had to use the services of one or another of them in order to massage his neck and shoulder to *805 afford him some relief. Taken together, their testimony produces a picture of a man who was alert, willing and capable of doing whatever was required of him in his work, and still willing to devote considerable effort to recreational activities with his men. After his return to work post-accident, he is presented as a man who is continually suffering pain and discomfort, and, as a result, restricts his efforts to those things which his job requires him to do. After a particularly active session of fire fighting, it is necessary that he seek relief from his obviously sore neck. Similarly, whereas he used to be able to perform all of his paper work at one sitting, he now finds it necessary to attend to these matters at short intervals of time, interrupted by the necessity of moving about to relieve the discomfort in his neck.
Similarly, there has been an effect upon Mr. Nuccio in his supplemental employment as a cab driver. The record reflects that initially Mr. Nuccio could not drive his taxicab at all for that period of time that he was on sick leave from the fire department. Thereafter he began to drive it for short periods of time and with great difficulty. Although this has now increased to the point where he drives it nearly as much as before, nevertheless, he is required to restrict his driving on numerous occasions simply because his neck pains would heighten and become intolerable. He felt this part-time driving that he was now doing was the limit of his endurance, and that he could not drive his cab to the extent that he formerly drove it. The evidence reflects that because of his wife’s illness it was necessary that he supplement his income as a fire captain in some manner due to his increased expenses, and that he had been holding down both of these jobs for a number of years prior to the accident. He is now faced with curtailment of his taxicab driving, as well as the prospect of possible retirement from the fire department because of his neck problems, coupled with the anxiety over Dr. Nix’s opinion of his heart condition. Evidence was produced by Dr. Irving Fosberg, a psychologist, to the effect that plaintiff was best suited for the two activities in which he was then engaged, and that plaintiff was limited as to a choice of job opportunities should he lose employment in either one of these two fields.
To summarize Mr. Nuccio’s condition, we find that he did not suffer angina pec-toris or heart disease as a result of the accident, but he did indeed have chest pains which were constant and severe for several months after the accident, then decreasing to moderate and intermittent, gradually disappearing at approximately one year post-accident. Now he only experiences chest pains at a strenuous fire, and this may be attributed to a lack of physical conditioning brought on by his sedentariness since the accident.
Plaintiff’s complaints of pain in the lumbar area cleared up almost immediately, but he experienced severe and constant neck pains for about two (2) months post-accident, then moderate and constant pains for about four (4) months post-accident, then diminishing in intensity. We conclude that he intermittently suffers pain and discomfort in the neck area, and that this condition is now permanent, and that he will never be completely free of pain. Whenever he engages in cab driving for a long period or writing lengthy reports, or engages in excessive activities at fires or recreation, he will suffer some discomfort, dependent upon the length of time and intensity of activity involved. We find that he has continued to do his work as a fire captain albeit with some discomfort, and, in some instances, at a slower rate. Similarly, he has engaged in his additional occupation as a cab driver, although on occasion he does not drive his cab for as long a period of time. He suffers from some anxiety because the physical condition brought on by the accident causes him to worry that he might be prematurely placed on a disability retirement pension. Thus, we conclude that this man has suffered considerable pain up to the -present time *806 and that he will continue to suffer pain intermittently for the rest of his life. We also find, that while he is not disabled from engaging in his two occupations, that nevertheless, it is obvious that his earning capacity has been affected and that in the future he faces the probability that this latter activity will be more severely curtailed, with the resulting loss of income.
The jury in the trial court awarded the plaintiff the sum of $35,000.00 as damages for such injuries. It is urged to us that we should not disturb that award, based upon the principles announced in the case of Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971), explaining the application of Louisiana Civil Code art. 1934(3), together with the line of jurisprudence cited therein. In the Miller case, the court made the following pronouncement:
“From these decisions, two principles emerge: (1) To modify the amount of an award for general damages, an appellate court must find that the trial judge or jury has abused the ‘much discretion’ accorded by the codal provision; (2) The awards in other cases serve only as an aid in determining whether there has been an abuse of discretion and rivet no steel frame of uniformity.
Applying these principles to a personal injury award often presents real difficulty. The facts relating to the injuries must be collated in each case. Upon these facts, the Court must focus an. informed judgment, tempered by a fair recognition of the discretion vested in the trial judge or jury.”
In applying those enunciated principles to this case, we are of the opinion that the jury did abuse its discretion in making an award of $35,000.00. In aid of this determination, we have been referred to a number of cases involving awards from $3,-000.00 to $52,000.00. Of these cases, the three (3) that seem to render the most aid to our consideration are the cases of Stoltz v. Continental Insurance Company, 231 So.2d 443 (La.App.4th Cir. 1970); Manning v. Herrin Transportation Company, 201 So.2d 314 (La.App.4th Cir. 1967); Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971), increasing the award made by the Court of Appeal, First Circuit in 231 So.2d 678 (1970). We are of the opinion that an award of $20,000.00 is reasonable and proper under the circumstances hereinabove explained.
For the reasons hereinabove expressed, we are of the opinion that the judgment of the trial court should be amended by reducing the amount of general damages from the sum of $35,000.00 to the sum of $20,000.00, and, as thus amended, should be affirmed. Costs of this appeal are assessed against appellee.
Amended and affirmed.